# Exhibit 1

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

IN RE:

**DOW CORNING CORPORATION**,

    **REORGANIZED DEBTOR**

CASE NO. 00-CV-00005-DT
(Settlement Facility Matters)

Hon. Denise Page Hood

STATE OF NEW YORK    )
                      )  ss.:
COUNTY OF NEW YORK   )

# DECLARATION OF PAUL J. HINTON

January 8, 2010

PAUL J. HINTON, being duly sworn, deposes and says:

1.      I am Vice President of National Economic Research Associates, Inc. ("NERA") in New York City, a position I have held since 2000.  NERA is an economic consulting firm.  I have been employed by NERA since 1994.  I earned a B.A. in Engineering Science in 1988 from New College, Oxford University, and a Masters in Public Policy in 1994 from the John F. Kennedy School of Government at Harvard University where my studies included economics and finance.

2.      I submit this Declaration in conjunction with Dow Corning Corporation's ("Dow Corning") Motion to Enforce Application of Time Value Credits Under the Amended Joint Plan of Reorganization and Related Documents ("Motion") and the supporting Memorandum, to provide an economic expert opinion as to the calculation of Time Value Credits and adjustment of Annual Payment Ceilings in determining Dow Corning's payment obligations to the Settlement Facility-Dow Corning Trust ("Settlement Facility").

3.      My curriculum vitae is attached at Tab 1 hereto.  I have testified previously as an expert witness in matters of economics and finance, specifically including the calculation of net present value and interest.  My experience includes the quantification of liabilities in product liability mass torts.

## I.      MATERIALS RELIED UPON

4.      In making the calculations set forth on Attachments A through E hereto and forming the opinions set forth in this Declaration, I have relied on the following:

§   Amended Joint Plan of Reorganization, dated February 4, 1999 (as updated June 1, 2004) (the "Plan");

§   The Amended Joint Disclosure Statement with Respect to Amended Joint Plan of Reorganization, February 4, 1999 ("Disclosure Statement");

§   The Funding Payment Agreement as amended as of June 1, 2004 (the "FPA");

§   Second Amended and Restated Depository Trust Agreement, dated as of June 1, 2004 ("Depository Trust Agreement");

§   The Settlement Facility and Fund Distribution Agreement, dated February 4, 1999; Effective Date June 1, 2004;

§ Report of the Financial Advisor, Dow Corning Qualified Settlement Fund Trust (monthly and quarterly reports through September 2009) ("Financial Advisor Reports");

§ Data received from the Financial Advisor on December 10, 2009 in the spreadsheet "Dow Corning Payments Thru 12-10-09 for D Greenspan.xls";

§ October 21, 2004 letter from Deborah Greenspan to Wendy Trachte-Huber;

§ February 15, 2001 Agreement and Order Approving Agreement to Arbitrate Regarding Dow Corning Settlement Facility Access to MDL 926 Claims Office Materials;

§ May 27, 2004 letter from Deborah Greenspan to Edgar Gentle;

§ September 30, 2003 Arbitrators Award regarding Dow Corning Settlement Facility Access to and Use of the MDL-926 Claims Office Materials;

§ Capitalization Agreement between American International Underwriters and the Class 6D Trust signed March 29, 2001;

§ Order Authorizing and Approving Compromise and Settlement with Gladys and Robert Laas and Jennifer Ladner dated February 2, 2000;

§ Order Authorizing and Approving Compromise and Settlement with Rebecca and Robert Stabile dated September 30, 1999;

§ February 11, 2004 Motion by Debtor to Confirm and Approve the Amount of the Initial Payment Paid to the Escrow Account Established Under the Depository Trust Agreement;

§ May 10, 2004 Stipulation and Order of Judge Denise Page Hood;

§ Dow Corning Corporation's Motion to Enforce Application of Time Value Credits Under the Amended Joint Plan of Reorganization and Related Documents ("Time Value Credit Motion");

§ Memorandum in Support of Time Value Credit Motion ("Memorandum").

## II.   BACKGROUND

5.     The Plan requires Dow Corning to make payments to the Settlement Facility in accordance with the FPA up to certain annual maximums ("Annual Payment Ceilings") "with a Net Present Value as of the Effective Date of $2.35 billion."[1]   The Plan defines Net Present Value as the result of discounting, cash flows at a compound annual rate of 7 percent to the June 1, 2004 Effective Date.

6.     The fundamental principle governing Dow Corning's financial obligation under the Plan is that its payments obligations for resolution of claims can not exceed a Net Present Value ("NPV") of $2.35 billion:  "[i]n no event shall Dow Corning be required to fund an

---

[1]   Plan §5.3.

2

amount … in excess of a net present value of $2,350,000,000."[2]  This amount constitutes a "cap" on the funding to be provided by Dow Corning.[3]

      7.      In addition to Dow Corning's initial funding obligation of $985 million ("Initial Payment"), the FPA contains a schedule of maximum annual payment obligations for each of 16 additional defined consecutive 12 month Funding Periods commencing on the anniversaries of the Effective Date ("Annual Payment Ceilings").[4]  For convenience, the period from the Effective Date until the first anniversary is referred to hereafter as Funding Period 0 and the Initial Payment as the Annual Payment Ceiling for Funding Period 0.  The Annual Payment Ceilings for each Funding Period are as follows:

| Funding Period | First Day of Funding Period | Annual Payment Ceiling |
|---|---|---|
| Funding Period 0 | 6/1/2004 | $985,000,000 |
| Funding Period 1 | 6/1/2005 | $47,000,000 |
| Funding Period 2 | 6/1/2006 | $103,000,000 |
| Funding Period 3 | 6/1/2007 | $374,000,000 |
| Funding Period 4 | 6/1/2008 | $204,000,000 |
| Funding Period 5 | 6/1/2009 | $205,000,000 |
| Funding Period 6 | 6/1/2010 | $113,000,000 |
| Funding Period 7 | 6/1/2011 | $31,000,000 |
| Funding Period 8 | 6/1/2012 | $149,000,000 |
| Funding Period 9 | 6/1/2013 | $149,000,000 |
| Funding Period 10 | 6/1/2014 | $186,000,000 |
| Funding Period 11 | 6/1/2015 | $189,000,000 |
| Funding Period 12 | 6/1/2016 | $188,000,000 |
| Funding Period 13 | 6/1/2017 | $80,000,000 |
| Funding Period 14 | 6/1/2018 | $34,000,000 |
| Funding Period 15 | 6/1/2019 | $73,500,000 |
| Funding Period 16 | 6/1/2020 | $61,500,000 |
| **Nominal Total** | | **$3,172,000,000** |
| **NPV** | | **$2,350,000,000** |

---

[2]    FPA §2.01.

[3]    Disclosure Statement, p.10.

[4]    FPA §2.01(b).

8.      The nominal amount of these Annual Payment Ceilings is $3.172 billion. According to the Plan and the FPA, the NPV of the Annual Payment Ceilings (including the $985 million Initial Payment) equals $2.35 billion when discounted at an annual compound rate of 7 percent as of the Effective Date.  The discounted Annual Payment Ceilings equal the $2.35 billion NPV cap when the Initial Payment obligation is fixed on the Effective Date and subsequent Annual Payment Ceilings are fixed on the first day of each Funding Period.  In actuality payments to the Settlement Facility will differ from this schedule because the need for additional funding to pay allowed eligible claims and administrative expenses of the Settlement Facility may arise at any time during each Funding Period.  The actual timing of payments also may differ because insurance proceeds are paid to the Settlement Facility as they are received by Dow Corning or paid directly by the insurers to the Trust in advance of the first day of each Funding Period.[5]

9.      Differences between the Annual Payment Ceilings and amount or timing of actual payments would affect the NPV of Dow Corning's funding obligations as of the Effective Date. Thus to maintain the NPV of the Dow Corning payment obligations at $2.35 billion, future Annual Payment Ceilings must be adjusted to account for differences in actual payment amounts and timing.  These adjustments are described in the FPA (Sections 2.01 through 2.05).

10.      Adjustments must be made to account for "early payments" made ahead or in "excess" of Annual Payment Ceilings, and for "deferred payment obligations" that occur when actual payments are less than Annual Payment Ceilings.  According to Section 2.01(a) of the FPA, adjustments are not made for payment of interest earned on the Initial Payment prior to the Effective Date ("Exempted Interest").

11.      If Dow Corning makes an early payment, the future Annual Payment Ceilings must be decreased to give credit (a "Time Value Credit") for paying early at 7 percent per annum from the date of receipt, compounded annually.[6]  Conversely, if the Settlement Facility does not need additional funding, any unpaid funding obligation for that Funding Period is rolled forward to the next Funding Period, and the Annual Payment Ceiling for that next Funding Period must

---

[5]   "The Annual Payment Ceiling shall not limit the amount of Insurance Proceeds to be paid to the Settlement Facility during any Funding Period." FPA §2.02(c).

[6]   See, e.g., FPA §2.01(a)(ii).

4

be increased to account for the deferred amount plus 7 percent per annum compounded annually.[7]  While Annual Payment Ceiling adjustments ensure that the NPV of payments and future payment obligations remains fixed at $2.35 billion, nominal aggregate funding obligation increase with deferrals and decrease with early payments.

12.     In general, funding payments and accrued Time Value Credits are applied to reduce the next Annual Payment Ceiling.[8]  The FPA defines an exception to the timing of Time Value Credits that applies to insurance proceeds received during the first three years after the Effective Date in excess of the Annual Payment Ceilings (the "Excess Insurance Proceeds").[9] Excess Insurance Proceeds and Time Value Credits that accrue on those proceeds are credited against the Annual Payment Ceilings in Funding Periods 5 through 8, with 50 percent in Funding Period 5, 30 percent in Funding Period 6, and 10 percent to be credited in each of Funding Periods 7 and 8.  Time Value Credits on Excess Insurance Proceeds are computed at 7 percent per annum, compounded annually from the date of receipt until the date the proceeds are credited.

## III.   THE NET PRESENT VALUE CAP

13.     An important feature of the Plan is that it provides a procedure for resolving pending and future claims while imposing an upper bound on liability.  It does so by establishing a cap of $2.35 billion NPV, measured as of the Effective Date of the Plan, on Dow Corning's payment obligations.

14.     Net Present Value is the result of discounting a stream of cash flows that occur at different points in the future to express them as an equivalent value at a single point in time (e.g., the present or, as pertinent here, the Effective Date.)  The difference between the nominal value and the discounted value of a cash flow reflects the time value of money.  The time value of money is a fundamental principle in economics and finance and describes how much less a sum

---

[7]   FPA §2.02(f).

[8]   In order for the adjustments to preserve the $2.35 billion NPV cap, once a Payment Ceiling is reduced to zero, Time Value Credits arising from any additional payments made before or during that Funding Period in excess of that Payment Ceiling are applied to the next Payment Ceiling.  According to Section 2.02(d) of the FPA, "the excess over the Annual Payment Ceiling will be credited against the Annual Payment Ceiling in the next Funding Period(s)."

[9]   FPA §2.03.

5

of money is worth if it can only be spent in the future rather than immediately.[10]  The time value of money can be expressed as a discount rate.  The NPV of a stream of historical cash flows can also be computed by accruing interest (compounding) at the same rate that reflects the time value of money.  Similarly, the equivalent future value of a current sum can be computed by adding the appropriate amount of interest to the current nominal value.

15.     The procedures to adjust Annual Payment Ceilings to account for early payments and  deferred payment obligations involve simple time value of money calculations to preserve the NPV of the sum of actual payments and future payment obligations (the $2.35 billion NPV cap).  The adjustment for early payment involves computing an amount of interest (Time Value Credit) to determine the equivalent value of a timely payment.  This Time Value Credit is then deducted from the next Annual Payment Ceiling as if the nominally higher equivalent timely payment had been made.  The adjustment for deferred payment obligations (*i.e.*, roll forward of payment obligations) involves computing the equivalent value of the deferred amount as of the first day of the next Funding Period.  An amount of interest is added to the nominal amount of the deferred payment as of the beginning of the Funding Period to determine the equivalent value of a deferred payment at the beginning of the next Funding Period.  This equivalent value is added to the next Annual Payment Ceiling.

16.     Failing to provide either a full Time Value Credit for an early payment or provide a time value adjustment to a deferred payment would result in the failure to preserve the $2.35 billion NPV cap on the sum of actual payments and future payment obligations in contravention of Section 2.01 of the FPA.

## A.  Time Value Credit Illustration

17.     Attachment A illustrates the effect of failing to apply a Time Value Credit for an early payment, and the effect of failing to roll forward deferred payment obligations, using the $374.0 million Annual Payment Ceiling payment obligation for Funding Period 3 in a hypothetical example.

---

[10] See e.g. Richard A. Brealey and Stewart C. Myers, "Principles of Corporate Finance."

6

18.     The NPV as of the Effective Date of the $374.0 million Funding Period 3 Annual Payment Ceiling is $305.3 million.  The first page of Attachment A Page 1 illustrates that if Dow Corning had paid $305.3 million on the Effective Date as an early payment of the Funding Period 3 Annual Payment Ceiling, Time Value Credits of $68.7 million would have been earned, which together with the early payment would have fully satisfied the Funding Period 3 funding obligation.

19.     The second page of Attachment A depicts the effect of deferring Funding Period 3 payment obligations until Funding Period 6 and applying a time value charge for the deferred payment.  This shows that had no payment been made until Funding Period 6, the deferred amount would have been rolled forward and time value charges totaling $84.2 million would be added to the deferred amount to give an adjusted Annual Payment Ceiling of $458.2 million.  In this example, had $458.2 million  been paid at the start of Period 6, it would have fully satisfied the Period 3 Funding obligation and the NPVof the payment as of the Effective date would have remained $305.3 million.

20.     Page three illustrates the effect of failing to apply any Time Value Credit for early payment of the Funding Period 3 payment obligation.  In that case,  the NPV of the early payment of  the Period 3 obligation would exceed the NPV of the original Funding Period 3 Annual Payment Ceiling.  This difference represents a hypothetical over-payment by Dow Corning of $68.7 million NPV.

21.     Conversely, as shown on the fourth page, failure to adjust the Annual Payment Ceilings for the deferral of Funding Period 3 payment obligations until Funding Period 6 would result in a hypothetical underpayment by Dow Corning of $56.1 million NPV.  In this example, the Annual Payment Ceilings each year after Funding Period 3 are not increased for the time value of the deferred payment, and thus the Annual Payment Ceiling in Period 6 remains at the same nominal amount as the Annual Payment Ceiling for Period 3.  The dollar amount paid in Period 6 has a lower NPV as of the Effective Date than the same dollar amount paid in Period 3.

22.     These hypothetical examples illustrate the potential over-payment and under-payment consequences of failing to adjust the Annual Payment Ceilings.

7

## IV.   ACTUAL FUNDING PAYMENTS

23.     Dow Corning and its insurers have made $1.6 billion in payments to the Settlement Facility through September 30, 2009 (excluding interest) [11] as set forth on Attachment B.  Dow Corning made several payments comprising the Initial Payment on various dates in 2001, and other payments on various dates, not precisely on each anniversary of the Effective Date.  Column (1) of the chart at Attachment B lists the dates of receipt by the Settlement Facility; column (5) lists the types of payment.  The aggregate amount of payments of each type is reported on Attachment E as follows:

a.   **Initial Payment**:  $985.0 million was paid in several installments in 2001 in accordance with the Depository Trust Agreement, with one additional pre-Effective Date installment in May 2004;

b.   **Class 6D Payment:**  $18.4 million was paid (via insurance proceeds) to settle Class 6D Claims on April 3, 2001;

c.   **Pre-Effective Date Insurance Proceeds:**  $211.5 million in insurance proceeds received prior to the Effective Date of the Plan were paid to the Settlement Facility on several dates in June 2004, after the Effective Date of the Plan but before the 90-day FPA limit;[12]

d.   **MDL Payment on Behalf of the Settlement Facility:** $2.9 million was paid to the MDL-926 Facility from Dow Corning's MDL 926 escrow account for use of certain materials that the MDL 926 Facility provided to the Settlement Facility;[13]

e.   **MDL Cash Payment:**  $2.2 million in cash was paid from Dow Corning's MDL 926 escrow account after the Effective Date of the Plan but before any payment obligation was due.

f.   **Class 4A Payment:**  $7.2 million was paid by Dow Corning on June 10, 2004, after the Effective Date of the Plan, for immediate distribution to Class 4A (Prepetition Judgment Claims) claimants;

g.   **Excess Insurance Proceeds:**  $214.4 million in Excess Insurance Proceeds were paid to the Settlement Facility after the Effective Date of the Plan;

---

[11]   Interest payments on the Initial Payment are not credited against the Annual Payment Ceilings. FPA §2.01(a).

[12]   FPA § 2.01(a)(ii) states that Insurance Proceeds received before the Effective Date by Dow Corning are to be paid to the Settlement Facility 90 days after the Effective Date.

[13]   This payment on behalf of the Settlement Facility is assumed to provide a credit against the Payment Ceilings. (See Memorandum.)

8

h. **Insurance Proceeds:** $130.3 million in Insurance Proceeds were paid, $57.7 million of which were paid in advance of funding obligations.[14]

24.    Attachment C reports the aggregate amount of Dow Corning payments to the Settlement Facility from Attachment B and reconciles this amount to the total Qualified Transfers reported in the Financial Advisor Report for September 2009.  The Financial Advisor includes certain interest payments and the value of "fixed assets transferred from the MDL," but excludes the Class 4A payment, the Class 6D payment, an interest over-payment adjustment and an MDL payment on behalf of the Settlement Facility.

## V.    TIME VALUE CREDITS AND ADJUSTMENTS TO ANNUAL PAYMENT CEILINGS

25.    Attachment D presents the Time Value Credits and adjustments to the Annual Payment Ceilings corresponding with actual funding payments made through September 30, 2009.  The table reports the amount of payments made in each period in Column (3).  Time Value Credits are then computed in Column (8) on amounts paid early, in excess of Annual Payment Ceilings.  Deferred payment obligations rolled forward are reported in Column (11).

26.    The first row reports activity during the time period preceding the Effective Date.  Prior to the Effective Date, Dow Corning made funding payments of $1,003.4 million (Column (5)).  These early payments earn Time Value Credits of $200.4 million (Column (8)), resulting in a balance of payments and Time Value Credits equal to $1,203.8 million (Column (9)), thereby exceeding the Initial Payment obligation of $985.0 million (in the next row of Column (1)).  As of the Effective Date, Dow Corning had exceeded the Annual Payment Ceiling for Funding Period 0 by $218.8 million ($1,203.8 million - $985.0 million). This balance was carried forward in column (7) along with Period 0 payments.

27.    The Time Value Credits earned in each Funding Period and reported in Column (8) are computed at the 7 percent annual compound rate from the date of payment to the end of the Funding Period.  Attachment E summarizes the Time Value Credits earned by each type of payment made through September 2009 (*i.e.*, part way through Funding Period 5, which ends on May 31, 2010).  Time Value Credits are calculated through the time they are applied against the Annual Payment Ceilings, typically the beginning of the next Funding Period.  However, for

---

[14]   Payments made in advance of funding obligations earn Time Value Credits.

Excess Insurance Proceeds, credits are applied through the start of Funding Period 8 and so continue to accrue Time Value Credit through the end of Funding Period 7.  The sum of these amounts is $370.1 million and matches the values in Column (8) of the table in Attachment D.

28.     The second row of the table in Attachment D shows how the balance of Time Value Credits earned on the pre-Effective Date payments plus the additional payments of $319.3 million (Column (3)) made in Funding Period 0 result in a balance of $538.1 million (Column(7)) as of the end of Funding Period 0.  This balance earns a Time Value Credit of $37.1 million (Column (8)).  Thus, before the start of Funding Period 1, the payment and Time Value Credit balance is $575.2 million compared to the Annual Payment Ceiling for that period of $47.0 million (Column (1)).

29.     The balance of funding payments and Time Value Credits (Column (9)) available at the end of each Funding Period to apply against the Annual Payment Ceiling in the next Funding Period is credited up to the amount of the Annual Payment Ceiling (Column (10)).  At the end of Funding Period 3, although the $325.7 million total balance (Column (9)) exceeds the Period 4 Annual Payment Ceiling, the available balance applied to the Annual Payment Ceiling of $64.0 million in Column (10) is less because a portion of the balance was made up of "Excess Insurance Proceeds," which, as explained above at paragraph 12, only become available to credit against the Annual Payment Ceilings in Funding Periods 5 through 8, with 50 percent to be credited in Funding Period 5, 30 percent in Funding Period 6, and 10 percent to be credited in each of Funding Periods 7 and 8.

30.     Column (11) reports the deferred payment obligations rolled forward to the end of each Funding Period.  There could be no deferred payments in Funding Periods 0 through 3 because the balance of prior payments and Time Value Credits fully met the funding obligations in these Periods (the adjusted Annual Payment Ceilings in Column (2) are zero).  For Funding Period 4 the Annual Payment Ceiling of $204.0 million (Column(1)) is reduced by the $64.0 million available balance of prior payments and Time Value Credits (Column (10)) to give an adjusted Annual Payment Ceiling at the beginning of the Period of $140.0 million (Column (2)). Payments of $63.6 million made during the Period (Column (3)) are all applied to the Annual Payment Ceilings.  Column (6) shows that the Payments Not Applied to Annual Payment Ceilings are zero.  The nominal amount of the deferred payment obligation is determined (in

accordance with the FPA §2.02(f)) by comparing the adjusted Annual Payment Ceiling at the beginning of the Period ($140.0 million) to the value of the payments ($63.6 million) discounted back to the beginning of the Period.[15]  This amount is then rolled forward to the end of the Funding Period increased to preserve the net present value as of the Effective Date (in accordance with the FPA §2.02(f)) and reported in Column (11):  an amount of $83.9 million.  This involves adding interest on the nominal amount of the deferred payment computed at the annual compound rate of 7 percent.  This is the upward adjustment to the Annual Payment Ceilings due to the partial deferral of the Funding Period 4 payment obligation.

31.    The $64.0 million balance of prior payments and Time Value Credits available to credit the Period 4 Annual Payment Ceiling plus the $63.6 million of Period 4 payments are fully applied to the Annual Payment Ceilings and so earn no Time Value Credit in Period 4.  The $18.3 million in Time Value Credits reported for Period 4 in Column (8) are earned on the balance of Excess Insurance Proceeds and accrued Time Value Credits not yet available to credit the Annual Payment Ceilings (in accordance with FPA §2.03(b)).  This amount contributes to the $280.0 million balance of payments and Time Value Credits reported in Column (9).

32.    These calculations are performed based on actual payments through September 2009.  However, Time Value Credits are accrued until they are applied to Annual Payment Ceilings.  The balance of prior payments and Time Value Credits continue to be applied to the Annual Payment Ceilings through Period 8 when the last of the Excess Insurance Proceeds and Time Value Credits become available.  Actual Dow Corning payments through September 2009 and future adjusted payment obligations, as of September 30, 2009, are reported in Column (5).  In aggregate, these amount to a nominal value of $2,812.6 billion which preserves the $2.35 billion NPV cap.

## VI.   CONCLUSION

33.    According to §5.3 of The Plan, Dow Corning's payment obligations to the Settlement Facility are limited by the FPA to $2.35 billion NPV as of the Effective Date (plus Exempted Interest).  The methodology described in the FPA and implemented in Attachment D

---

[15]   The value of the payments discounted back to the beginning of the Period at the annual compound rate of 7 percent is not reported on Attachment A but is used to compute the deferred payment obligations rolled forward to the end of the year, reported in Column (11).

preserves the $2.35 billion NPV cap.  Any calculation that omits payments made in satisfaction of Dow Corning's funding obligation, fails to apply associated Time Value Credits, or only applies associated Time Value Credits over a limited number of Funding Periods, will not preserve the $2.35 billion NPV cap.  For example, failing to apply all Time Value Credits discussed herein and shown in Attachments D and E would increase the NPV of Dow Corning's payment obligations (based on data as of September 30, 2009) to $2.64 billon – in excess of the $2.35 billion NPV cap.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on January 8, 2010.


_____
Paul J. Hinton

# Exhibit 1
# Attachment A

**Attachment A**

**Hypothetical Illustration of Early payment of Funding Period 3 Obligations**
**Properly accounting for Time Value Credits ("TVC") and Ceiling Adjustments**

| Funding Period | | Dow Corning Payment | Payment Ceiling | Balance of Payments and Ceilings (Start of Period) | | TVC Earned | Adjustment to Payment Ceiling |
|---|---|---|---|---|---|---|---|
| | | | | Payments and Earned TVC | Adjusted Ceiling | | |
| (1) | | (2) | (3) | (4) | (5) | (6) | (7) |
| | | | | = (2) + prev{(4)+(6)} | = (3) + prev{(5)+(7)} | =(4)×7% | =(5)×7% |
| 6/1/2004 | Effective Date | $305,295,406 | - | $305,295,406 | - | $21,370,678 | - |
| 6/1/2005 | Period 1 | - | - | $326,666,084 | - | $22,866,626 | - |
| 6/1/2006 | Period 2 | - | - | $349,532,710 | - | $24,467,290 | - |
| 6/1/2007 | Period 3 | - | $374,000,000 | $374,000,000 | $374,000,000 | - | - |
| 6/1/2008 | Period 4 | - | - | - | - | - | - |
| 6/1/2009 | Period 5 | - | - | - | - | - | - |
| 6/1/2010 | Period 6 | - | - | - | - | - | - |
| | **Total** | **$305,295,406** | **$374,000,000** | | | **$68,704,594** | **-** |
| | **NPV[1]** | **$305,295,406** | **$305,295,406** | | | | |
| | **Over-payment[2]** | **$0** | | | | | |

**Notes:**

[1]  Net Present Value ("NPV") is computed using a 7 percent annually compounded discount rate as of the Effective Date (June 1, 2004).

[2]  Over-payment is computed as the difference in the NPV of the Dow Corning Payment and the NPV of the Annual Payment Ceiling.

**Attachment A**
**Hypothetical Illustration of Late payment of Funding Period 3 Obligations**
**Properly accounting for Time Value Credits ("TVC") and Ceiling Adjustments**

| Funding Period | | Dow Corning Payment | Payment Ceiling | Balance of Payments and Ceilings (Start of Period) | | TVC Earned | Adjustment to Payment Ceiling |
| | | | | Payments and Earned TVC | Adjusted Ceiling | | |
| (1) | | (2) | (3) | (4) | (5) | (6) | (7) |
| | | | | = (2) + prev{(4)+(6)} | = (3) + prev{(5)+(7)} | =(4)×7% | =(5)×7% |
| 6/1/2004 | Effective Date | - | - | - | - | - | - |
| 6/1/2005 | Period 1 | - | - | - | - | - | - |
| 6/1/2006 | Period 2 | - | - | - | - | - | - |
| 6/1/2007 | Period 3 | - | $374,000,000 | - | $374,000,000 | - | $26,180,000 |
| 6/1/2008 | Period 4 | - | - | - | $400,180,000 | - | $28,012,600 |
| 6/1/2009 | Period 5 | - | - | - | $428,192,600 | - | $29,973,482 |
| 6/1/2010 | Period 6 | $458,166,082 | - | $458,166,082 | $458,166,082 | - | - |
| | **Total** | **$458,166,082** | **$374,000,000** | | | **-** | **$84,166,082** |
| | **NPV[1]** | **$305,295,406** | **$305,295,406** | | | | |
| | **Under-payment[2]** | **$0** | | | | | |

**Notes:**

[1]  Net Present Value ("NPV") is computed using a 7 percent annually compounded discount rate as of the Effective Date (June 1, 2004).

[2]  Under-payment is computed as the difference in the NPV of the Annual Payment Ceiling and the NPV of the Dow Corning Payment.

**Attachment A**

**Hypothetical Illustration of Early payment of Funding Period 3 Obligations**
**Failing to account for Time Value Credits ("TVC") and Ceiling Adjustments**

| Funding Period | | Dow Corning Payment | Payment Ceiling | Balance of Payments and Ceilings (Start of Period) | | TVC Earned | Adjustment to Payment Ceiling |
|---|---|---|---|---|---|---|---|
| | | | | Payments and Earned TVC | Adjusted Ceiling | | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| | | | | = (2) + prev{(4)+(6)} | = (3) + prev{(5)+(7)} | = 0 | = 0 |
| 6/1/2004 | Effective Date | $374,000,000 | - | $374,000,000 | - | - | - |
| 6/1/2005 | Period 1 | - | - | $374,000,000 | - | - | - |
| 6/1/2006 | Period 2 | - | - | $374,000,000 | - | - | - |
| 6/1/2007 | Period 3 | - | $374,000,000 | $374,000,000 | $374,000,000 | - | - |
| 6/1/2008 | Period 4 | - | - | - | - | - | - |
| 6/1/2009 | Period 5 | - | - | - | - | - | - |
| 6/1/2010 | Period 6 | - | - | - | - | - | - |
| | **Total** | **$374,000,000** | **$374,000,000** | | | - | - |
| | **NPV[1]** | **$374,000,000** | **$305,295,406** | | | | |
| | **Over-payment[2]** | **$68,704,594** | | | | | |

**Notes:**
[1] Net Present Value ("NPV") is computed using a 7 percent annually compounded discount rate as of the Effective Date (June 1, 2004).

[2] Over-payment is computed as the difference in the NPV of the Dow Corning Payment and the NPV of the Annual Payment Ceiling.

**Attachment A**
**Hypothetical Illustration of Late payment of Funding Period 3 Obligations**
**Failing to account for Time Value Credits ("TVC") and Ceiling Adjustments**

| Funding Period | | Dow Corning Payment | Payment Ceiling | Balance of Payments and Ceilings (Start of Period) | | TVC Earned | Adjustment to Payment Ceiling |
|---|---|---|---|---|---|---|---|
| | | | | Payments and Earned TVC | Adjusted Ceiling | | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| | | | | = (2) + prev{(4)+(6)} | = (3) + prev{(5)+(7)} | = 0 | = 0 |
| 6/1/2004 | Effective Date | - | - | - | - | - | - |
| 6/1/2005 | Period 1 | - | - | - | - | - | - |
| 6/1/2006 | Period 2 | - | - | - | - | - | - |
| 6/1/2007 | Period 3 | - | $374,000,000 | - | $374,000,000 | - | - |
| 6/1/2008 | Period 4 | - | - | - | $374,000,000 | - | - |
| 6/1/2009 | Period 5 | - | - | - | $374,000,000 | - | - |
| 6/1/2010 | Period 6 | $374,000,000 | - | $374,000,000 | $374,000,000 | - | - |
| | **Total** | **$374,000,000** | **$374,000,000** | | | **-** | **-** |
| | **NPV[1]** | **$249,211,992** | **$305,295,406** | | | | |
| | **Under-payment[2]** | **$56,083,414** | | | | | |

**Notes:**
[1]  Net Present Value ("NPV") is computed using a 7 percent annually compounded discount rate as of the Effective Date (June 1, 2004).

[2]  Under-payment is computed as the difference in the NPV of the Annual Payment Ceiling and the NPV of the Dow Corning Payment.

# Exhibit 1
# Attachment B

# FILED UNDER SEAL

# Exhibit 1
# Attachment C

## FILED UNDER SEAL

# Exhibit 1
# Attachment D

**Attachment D**
**Dow Corning Trust Settlement Facility Time Value Credits ("TVC") Calculations**
**Reflecting payments through September 2009**
**(millions)**

| Funding Period | Payment Ceilings (Start of Funding Period) | | Dow Corning Payments and Obligations | | | Balance of Payments and TVC Remaining at End of Funding Period | | | | Balance Applied to Ceilings[9] | Deferred Payment Obligations Rolled Forward[10] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Annual Payment Ceiling[1] | Ceiling Adjusted for TVC & Deferred Payment Obligation[2] | Dow Corning Payments to Date[3] | Current Payment Ceilings[4] | Payments + Future Obligations | Payments Not Applied to Ceilings[5] | Payments + Balance from Prior Period[6] | TVC Earned on Early Payments[7] | Total Payment and TVC Balance[8] | | |
| | (1) | (2) = (1)+prev(11)-prev(10) | (3) | (4) | (5) = (3)+(4) | (6) | (7) = (6)+prev(9)-prev(10) | (8) | (9) = (7)+(8) | (10) | (11) |
| Pre-effective | - | - | $1,003.4 | | $1,003.4 | $1,003.4 | $1,003.4 | $200.4 | **$1,203.8** | $985.0 | - |
| Period 0[11] | $985.0 | - | $319.3 | | $319.3 | $319.3 | $538.1 | $37.1 | **$575.2** | $47.0 | - |
| Period 1 | $47.0 | - | $64.8 | | $64.8 | $64.8 | $593.0 | $39.0 | **$632.0** | $103.0 | - |
| Period 2 | $103.0 | - | $54.0 | | $54.0 | $54.0 | $583.0 | $39.5 | **$622.5** | $374.0 | - |
| Period 3 | $374.0 | - | $57.7 | | $57.7 | $57.7 | $306.3 | $19.4 | **$325.7** | $64.0 | - |
| Period 4 | $204.0 | $140.0 | $63.6 | | $63.6 | - | $261.7 | $18.3 | **$280.0** | $140.0 | $83.9 |
| Period 5 | $205.0 | $148.9 | $8.9 | $143.1 | $152.1 | - | $140.0 | $9.8 | **$149.8** | $89.9 | |
| Period 6 | $113.0 | $23.1 | - | $23.1 | $23.1 | | $59.9 | $4.2 | **$64.1** | $31.0 | |
| Period 7 | $31.0 | - | - | - | - | | $33.1 | $2.3 | **$35.4** | $35.4 | |
| Period 8 | $149.0 | $113.6 | - | $113.6 | $113.6 | | - | - | **-** | - | |
| Period 9 | $149.0 | $149.0 | - | $149.0 | $149.0 | | | - | **-** | - | |
| Period 10 | $186.0 | $186.0 | - | $186.0 | $186.0 | | | - | **-** | - | |
| Period 11 | $189.0 | $189.0 | - | $189.0 | $189.0 | | | - | **-** | - | |
| Period 12 | $188.0 | $188.0 | - | $188.0 | $188.0 | | | - | **-** | - | |
| Period 13 | $80.0 | $80.0 | - | $80.0 | $80.0 | | | - | **-** | - | |
| Period 14 | $34.0 | $34.0 | - | $34.0 | $34.0 | | | - | **-** | - | |
| Period 15 | $73.5 | $73.5 | - | $73.5 | $73.5 | | | - | **-** | - | |
| Period 16 | $61.5 | $61.5 | - | $61.5 | $61.5 | | | - | **-** | - | |
| **Total** | **$3,172.0** | | **$1,571.8** | **$1,240.8** | **$2,812.6** | | | | **$370.1** | | |
| **NPV[12]** | **$2,350.0** | | **$1,726.0** | **$624.0** | **$2,350.0** | | | | | | |

**Attachment D**
**Dow Corning Trust Settlement Facility Time Value Credits ("TVC") Calculations**
**Reflecting payments through September 2009**
**(millions)**

**Notes and Sources:**

[1]   The Annual Payment Ceilings are specified in § 2.01(b) of the FPA.

[2]   The Annual Payment Ceilings in column (1) are revised down ("credited") by the balance of excess payments and TVC not applied to a previous Payment Ceiling, as set forth in column (10): "Balance Applied to Ceilings."  The Annual Payment Ceilings are adjusted up by any "Deferred Payment Obligations" in column (11) derived by rolling forward any unfunded Annual Payment Ceiling from the prior Funding Period.  The balance available at the end of Period 6 to apply to Ceilings is $32.1 million which exceeds the Period 7 Ceiling.  Consequently the excess available balance is rolled forward and applied to the Period 8 Ceiling.

[3]   Individual payments through September 30, 2009 are listed in Attachment B and are from the Report of the Financial Advisor, Dow Corning Qualified Settlement Fund Trust (monthly and quarterly reports through September 2009).  This information is supplemented by data received from the Financial Advisor on December 10, 2009 in the spreadsheet *Dow Corning Payments Thru 12-10-09 for D Greenspan.xls* .  Also included are a $18,400,000 Class 6D Payment, a $512,398 interest over-payment that has been reclassified as an Initial Payment, a $2,900,000 payment made by Dow Corning to the MDL-926 Settlement Fund on behalf of the Settlement Facility, and a $7,200,000 Class 4A Payment.

[4]   The Current Payment Ceilings reflect adjustments for payments received through September 30, 2009.  These equal the Adjusted Payment Ceilings in Column (2) with the exception of the current Funding Period (Period 5).  The Adjusted Payment Ceiling at the start of Funding Period 5 of $148.9 million is reduced for payments received prior to September 30, 2009 and is increased for the roll forward of the remaining unfunded balance of the adjusted Ceilings.  The roll forward procedure preserves the NPV of the Ceilings as of the Effective Date (see FPA § 2.02(f).)  This involves adding an amount of interest on the remaining balance calculated at an annual compounded rate of 7 percent over the roll forward period.

[5]   Payments made to the Settlement Facility during a Funding Period are credited to outstanding adjusted Annual Payment Ceilings as they are received.  The outstanding adjusted Annual Payments Ceilings are modeled daily.  Adjusted Annual Payment Ceilings are revised down for payments received during the Funding Period and are adjusted up for the roll forward of deferred payments. Payments Not Applied to Ceilings include the portion of any payment that is not credited to an Annual Payment Ceiling because the payment exceeds the outstanding adjusted Annual Payment Ceiling.  Payments are credited to the adjusted Annual Payment Ceilings in the order that they are received by the Settlement Facility.

[6]   Current Funding Period payments plus the balance from the prior Period, after meeting payment obligations, earn TVC reported in column (8).

[7]   TVC is accrued at 7 percent per annum on Insurance Proceeds and Dow Corning payments made to the Settlement Facility in excess of the adjusted Annual Payment Ceilings in each period.  Such payments continue to earn TVC from the day they are made until the payments and the associated TVC are credited to an adjusted Annual Payment Ceiling.  Payments and associated TVC are credited on a FIFO basis.

[8]   Total Payment and TVC Balance includes the TVC accrued in the Funding Period plus the payments and TVC accrued in previous Funding Periods but not yet credited to adjusted Annual Payment Ceilings.

[9]   Some entries in the Balance Applied to Ceilings, column (10), are less than the Payment and TVC Balance, column (9), because according to the FPA, insurance proceeds received after the Effective Date and before Funding Period 3 in excess of the adjusted Annual Payment Ceilings ("Excess Insurance Proceeds") and TVC accrued on Excess Insurance Proceeds are not available to credit the Annual Payment Ceilings until Funding Periods 5 through 8.  See FPA § 2.03(b).

[10]   Deferred Payment Obligations Rolled Forward are the amount by which prior payments and TVC fall short of prior Annual Payment Ceilings adjusted upwards to preserve the $2.35 billion NPV cap at the end of the Funding Period.

[11]   "Period 0" is a term used here for convenience to refer to the one year period beginning on the Effective Date (June 1, 2004 through May 31, 2005).

[12]   Net Present Value ("NPV") is computed using a 7 percent annually compounded discount rate as of the Effective Date (June 1, 2004).

# Exhibit 1
# Attachment E

**Attachment E**
**Total Payments and Time Value Credits ("TVC") by Type of Payment through September 2009**

| | Pre-Effective Date Payments | | Post-Effective Date Payments | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Period | Initial Payment | Class 6D Payment | Pre-Effective Date Insurance | MDL Payment on Behalf of SF | MDL Cash Payment | Class 4A Payment | Excess Insurance Proceeds | Insurance Proceeds | Total |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) |
| **Total Payments** | **$985,000,000** | **$18,400,000** | **$211,456,278** | **$2,900,000** | **$2,180,656** | **$7,200,000** | **$214,363,369** | **$130,307,593** | **$1,571,807,896** |
| through Period 3 | $985,000,000 | $18,400,000 | $211,456,278 | $2,900,000 | $2,180,656 | $7,200,000 | $214,363,369 | $57,736,990 [1] | $1,499,237,294 |
| **TVC Earned** | **$231,177,891** | **$4,413,664** | **$47,732,316** | **$646,894** | **$486,695** | **$1,606,081** | **$81,990,456** | **$2,033,086** | **$370,087,085** |
| Pre-effective | $195,963,844 | $4,413,664 | - | - | - | - | - | - | $200,377,508 |
| Period 0 | $15,314,426 | - | $14,689,360 | $197,995 | $148,812 | $491,573 | $6,285,259 | - | $37,127,423 |
| Period 1 | $13,096,435 | - | $15,830,195 | $216,860 | $163,063 | $538,410 | $9,196,811 | - | $39,041,773 |
| Period 2 | $6,803,186 | - | $16,938,308 | $232,040 | $174,477 | $576,099 | $14,751,340 | - | $39,475,450 |
| Period 3 | - | - | $274,453 | - | $344 | - | $17,121,775 | $2,033,086 | $19,429,659 |
| Period 4 | - | - | - | - | - | - | $18,320,299 | - | $18,320,299 |
| Period 5 | - | - | - | - | - | - | $9,801,360 | - | $9,801,360 |
| Period 6 | - | - | - | - | - | - | $4,194,982 | - | $4,194,982 |
| Period 7 | - | - | - | - | - | - | $2,318,631 | - | $2,318,631 |

**Notes and Sources:**

This table summarizes the payments listed on Attachment B and the Time Value Credits computed on Attachment D.

Time Value Credits as of September 30, 2009 include credits on all payments made prior to October 2009 (part way through Funding Period 5, which ends on May 31, 2010) through the date that the credits are applied against the Payment Ceilings in subsequent Periods. For Excess Insurance Proceeds, credits are applied through start of Funding Period 8 and so continue to accrue Time Value Credit through the end of Funding Period 7.

[1] Insurance Proceeds paid in Funding Periods 4 and 5 (see Attachment B) do not accrue Time Value Credits because they are credited against the outstanding adjusted Annual Payment Ceiling for the Funding Period in which they were paid, immediately upon receipt by the Settlement Facility.

# Exhibit 1
# Tab 1

# NERA
Economic Consulting

**Paul J. Hinton**
Vice President

National Economic Research Associates, Inc.
1166 Avenue of the Americas
New York, New York 10036
+1 212 345 3000 Fax +1 212 345 4650
Direct dial: +1 212 345 5360
paul.hinton@nera.com
www.nera.com

## PAUL J. HINTON
## Vice President

Mr. Hinton works on a wide range of advisory, litigation support, and testifying engagements. His experience includes securities and finance litigation, complex commercial disputes, product liability valuation, antitrust litigation, merger analysis, intellectual property valuation, regulatory matters, and transfer pricing. He has testified at deposition and before legislative committee.

In securities litigation involving 10b-5 and Section 11 claims, Mr. Hinton has developed analyses to provide an empirical basis for assessing liability, causation, and damages. These cases typically require event study analysis to quantify the impact of company-specific and marketwide events on stock prices. Other finance and commercial litigation cases have involved the valuation of assets and liabilities such as entire business operations, complex derivative securities, specific disputed contractual terms, and embedded intellectual property.

In product liability cases, Mr. Hinton has estimated the value of future personal injury claims associated with silicone breast implants, asbestos, building defects, and pharmaceuticals. He has provided product liability valuation analysis in connection with corporate risk management, bankruptcy estimation, insurance coverage disputes, fraudulent conveyance actions, corporate litigation, and policy analysis.

Mr. Hinton has conducted empirical analyses of markets affected by alleged antitrust violations, mergers, and deregulation. He has used "scanner data," survey methods, and other data sources to analyze market supply and demand. Specific examples include estimation of the impact on prices of mergers in consumer products markets, analysis of the effect of price fixing and bid rigging, analysis of price discrimination claims, assessment of market power derived from control of alleged bottleneck facilities, and measurement of the effectiveness of regulations intended to provide competitive safeguards. In telecommunications markets, his work has included regulatory analysis of access-pricing rules, line-of-business restrictions, price floors and universal-service subsidies, and competitive analysis of pricing strategies using product bundling and discount plans.

Mr. Hinton has also performed empirical analysis to determine the intellectual property value associated with a patented product and to value brand names in connection with intellectual property litigation, risk management, and strategic consulting engagements.

Paul J. Hinton

## Education

**John F. Kennedy School of Government, Harvard University**
Master in Public Policy, 1994

**New College, Oxford University**
B.A., Engineering Science, 1988

## Professional Experience

|  | **NERA Economic Consulting** |
|---|---|
| 2000- | Vice President |
|  | Advisory consulting and litigation support involving the economics of antitrust, product liability/mass torts, regulation, securities and commercial litigation, intellectual property, and transfer pricing. |
| 1998-2000 | Senior Consultant |
| 1996-1998 | Senior Analyst |
| 1994-1996 | Analyst |

|  | **Morgan Grenfell & Co.** |
|---|---|
| 1993 | Investment Analyst |
|  | Project finance, privatization, and investment technical assistance to projects in Eastern Europe. |

|  | **Commission of the European Communities** |
|---|---|
| 1992 | Program Officer |
|  | Economic development project management and technical assistance to Hungarian government departments (PHARE program). |

|  | **Andersen Consulting** |
|---|---|
| 1989-1992 | Senior Consultant |
|  | Management and information systems consulting for public hospitals and utilities. |

## Testimony

Deposition Testimony, on behalf of Celgene Corporation in *Cambrex Corporation Plaintiff v. Celgene Corporation Defendant* (Superior Court of New Jersey Law Division: Bergen County), November 2009.

Deposition Testimony, on behalf of IDEX in *MARTIN RAPAPORT, et al..  Plaintiffs v. IDEX Online Ltd., et al. Defendants, Index No.* (United States District Court Southern District Of New York ), August 2008.

Paul J. Hinton

Deposition Testimony, on behalf of a defendant in *IDT Telecom, Inc., and Union Telecard Alliance, LLC v.  CVT Prepaid Solutions, Inc. et al.* (United States District Court for the District of New Jersey), May 2007.

Testimony on behalf of the Pennsylvania Builders Association's Requirement to Repair before the Pennsylvania House Urban Affairs Committee, Allentown PA, June 2005.

Deposition Testimony in *William H. Wilkerson v. Centura Banks, Inc. et al.,* regarding executive compensation, January 2003.


## Publications

"Clawbacks from Madoff Investors: Questions of Economics, Equity, and Law" (with Jan Larsen and Joshua M. Bennett), April 28, 2009.

"SEC Settlements in Ponzi Scheme Cases: Putting Madoff and Stanford in Context" (with Jan Larsen), March 13, 2009.

 "Use of Sample Surveys in Product Liability Litigation" (contributing author with Kent van Liere and Frances Barlas) in Global Legal Group, *The International Comparative Legal Guide to: Product Liability 2007.*

"Tort Liability Costs for Small Business" (with Judyth W. Pendell) in conjuction with the US Chamber of Commerce Institute for Legal Reform, May 2007.

 "Where are Mesothelioma Claims Heading?" (with Frederick C. Dunbar, Ronald Miller and Faten Sabry, November 13, 2006), for *Mealey's Asbestos Conference,* December 2006.

"Options Backdating: Accounting, Tax, and Economics" (with Patrick Conroy and Thomas Porter), the second installment of the NERA Insights: Options Backdating Series, November 2006.

"Forecasting Asbestos Liability After Recent Bankruptcy Decisions: How Forecasts Must Adjust for Changes in the Tort System" (with Frederick C. Dunbar and Faten Sabry) for *Mealey's Asbestos Bankruptcy* Conference, June 2006.

"Forecasting Product Liability by Understanding the Driving Forces" (with Lucy Allen, Denise Martin, Simona Heumann, and Faten Sabry) in Global Legal Group, *The International Comparative Legal Guide to Product Liability 2006: A Practical Insight to Cross-Border Product Liability Work.*

 "Construction Defect Disputes: Getting to Yes without Going to Court" in conjunction with the National Association of Home Builders, June 2005.

Paul J. Hinton

"Costs of Asbestos Litigation and Benefits of Reform" (with Denise Martin, Faten Sabry, Ron Miller and Stephanie Plancich), prepared for National Association of Manufacturers Asbestos Alliance, April 25, 2005.

"Non-Malignant Dose Response Models: A Basis for Forecasting Asbestos Related Non-Malignant Disease," in conjunction with *Lexis-Nexis Wall Street Forum: Asbestos*, New York, New York, February 2005.

"Liability Costs for Small Business" (with Judyth W. Pendell) in conjuction with the US Chamber of Commerce Institute for Legal Reform, June 2004.

"Valuing and Protecting Brands" (with D. Abrahams and G. Jurkowich), *ACT Manual of Corporate Finance and Treasury Management Bulletin*, Issue 2, Rand Publications (August 2000).

"Regulating Access: Using Economic Principles to Ensure Fair and Efficient Competition" (with J.D. Zona), *The Electricity Journal*, August 2000.

"An Analysis of the Welfare Effects of Long Distance Market Entry by an Integrated Access and Long Distance Provider" (with R. Schmalensee and W.E. Taylor), *Journal of Regulatory Economics* 13, 1998.

"The Securities Litigation Environment: Will Reform Make a Difference?" (with Frederick C. Dunbar), presented at the Conference of Directors' and Officers' Liability and Insurance in London, May 1995.


## Presentations

"CDW, the Numbers and the Impact on All Parties," panel discussion (with Katherine Cahill and Bruce Hallock) on quantifying the extent of liability exposure and the design of hazard studies needed to identify risk factors, delivered at the Chinese Drywall Litigation & Insurance Coverage Update Conference, hosted by HB Litigation Conferences, New Orleans LA, November 11, 2009.

"The Subprime Crisis in Perspective," Marsh's 2008 Breakfast Series: Risk Management in Challenging Economic Times, Rochester NY, November 20, 2008.

"The Value of Active Risk Evaluation and Mitigation Strategies for Products Liability Exposures," panel discussion at the *American Bar Association's Section of Litigation "Third Annual Biotech Institute and Regional CLE Workshop,"* Rockville, MD, October 8, 2008.

"Collateral Losses, An Alternative Explanation For Price Declines," NERA Finance Law & Economics Seminar, Aspen Colorado, July 6-9, 2008.

Paul J. Hinton

Delivered opening remarks on the economics of product recalls, as Co-Chair of the M*ealey's Product Recall Conference: Made in China and Beyond,* Washington, DC, December 10-11, 2007.

"Drug and Medical Device Litigation: Understanding Liability Risk Management and Strategy" on the benefits of active liability risk assessment, delivered at the IQPC Drug & Medical Device Litigation conference, New York, NY, October 25, 2007.

"Drug and Medical Device Litigation: Scientific Evidence in the Courtroom in Mass Tort Cases," on signal detection, risk assessment and liability valuation, delivered at the IQPC Drug & Medical Device Litigation conference, New York, NY, March 27-28, 2007.

"Making Sense of Aggregate Damages," NERA Finance Law & Economics Seminar, Deer Valley Utah, July 2-5, 2006.

"Asbestos Bankruptcies: Past, Present, and Future," on the effects of changes in the tort system to estimations of debtors' liabilities.  Panel discussion at the ALI-ABA *Asbestos Litigation in the 21st Century*, New Orleans, LA, November 30, 2006.

"Estimating Future Asbestos Claims: Lessons from Owens Corning," on how the outcome of the estimation hearing may affect future cases, at the *Mealey's Asbestos Bankruptcy Conference*, Chicago, IL, June 9, 2005.

 "Where Are the Asbestos Claims Going?" on current trends and forecasts of future asbestos personal injury claims, at the *Lexis-Nexis Wall Street Forum: Asbestos*, New York, NY, February 28, 2005.

"Building Defect Litigation: The Case for Reform," on the empirical results of a series of case studies that showed a decline in litigation following enactment of Notice and Opportunity to Repair legislation, at the *National Association of Home Builders' Conference*, Biloxi, MI, November 4, 2004.

"Recent Trends in Shareholder Litigation," on shareholder class action litigation including the impact of the Sarbanes-Oxley Public Company Accounting Reform and Investor Protection Act, online audio webcast at the *SEC Historical Society*, Washington, DC, July 27, 2004.

"Managed Care Organization Class Actions by Providers and Subscribers: Lessons from other Industries' Mass Tort Litigation," panel discussion at the *Marsh HealthCare Forum*, Colorado Springs, CO, September 7-9, 2003.

"Electromagnetic Fields -- Risks and Responses," workshop on cellphone radiation health risks at the Marsh Technology & Telecommunications Summit, San Francisco, CA, August 18-20, 2003.

"How to Avoid Expert Spoliation," NERA Finance Law & Economics Seminar, Deer Valley Utah, July 4-5, 2003.

Paul J. Hinton

"Cell Phone Radio Frequency Hazards: The Potential for Mass Tort Litigation," at the *Marsh Telecom Forum*, Dallas, TX, October 16-17, 2002.

## Reports and Project Output

*Celgene Corporation v. Cambrex Corporation,* (with Dr. Victor Goldberg) Damages analysis and rebuttal of plaintiff Cambrex's experts' breach of contract claims for lost manufacturing rights, rights to alleged patent improvements and lost royalties through alleged premature lapse of specific patents, August 2009.

Analysis of causation and damages for a mediation of a contract dispute in the auto-parts industry, concerning the manufacturing rights and obligations of the parties and compliance with the non-compete provisions, July 2009.

*In re: 2006 NPM Adjustment Determination proceeding,* act as economic consultants to the states and tobacco companies to determine whether the disadvantages experienced as a result of the provisions of the 1998 Master Settlement Agreement were a significant factor contributing to the Market Share Loss, March 2009.

Product liability valuation related to future potential claims against Chinese manufacturer of products recalled from the U.S. market, January 2009.

Expert Report in *Rapaport v. IDEX Online* (United States District Court for the Southern District of New York), regarding Lanham Act and unfair competition counterclaims alleging predatory bundling and refusal-to-deal, April 2008.

*In re: UBS Securities LLC and UBS Loan Finance LLC vs. The Finish Line, Inc. and Genesco Inc,* concerning material adverse change in business prospects for the footwear industry, February 2008.

Report for ING Insurance N.V. on the potential exposure from future mass tort claims in connection with run-off of its UK insurance subsidiary, July 2008.

*In re: Livedoor Securities Litigation,* Shareholder litigation brought under Japanese Securities and Exchange Act, July 2008.

Due diligence advisory work to value potential liability exposure from Manganese personal injury claims, December 2007.

Provide economic analysis on behalf of the Special Litigation Committee of Broadcom Corp., concerning potential shareholder class action damages and derivative claims resulting from alleged option backdating, October 2007.

Paul J. Hinton

Affidavit, on behalf of a defendant in *IDT Telecom, Inc., and Union Telecard Alliance, LLC v. CVT Prepaid Solutions, Inc. et al.* (United States District Court for the District of New Jersey), May 2007.

*In re: Cablevision/Rainbow Media Tracking Stock Litigation,* analysis of liability and damages in connection with disputed terms of redemption, April 2007.

In the Federal Court of Australia – New South Wales District Registry in *Dorajay Pty Ltd. v. Aristocrat Leisure Limited*, on causation, materiality, and damages in a shareholder fraud claim in Australia, 2007.

*In the Matter of Integrated Electrical Services, Inc.* [FW-02856], concerning materiality of certain books and records allegations made by the SEC, June 2006.

*SEC v. Federal National Mortgage Association, Case No. 06-00959 (RBW) (U.S.D.C., D.D.C)*, Assist counsel to Fannie Mae in analyzing the effect of alleged improper accounting on the firm's debt funding costs, May 2006.

*In re: Mercury Interactive Corp. Securities Litigation, Master File No. 5:05-CV-3395*, concerning materiality and damages from alleged option backdating disclosure failures, 2006.

*In re: Special Situations Fund III, L.P., et al. v. Quovadx, Inc., et al.,* (United States District Court for the District of Colorado) on damages in a Section 11 class action, 2006.

*In re: Continuum Health Partners Inc., et al. v. Ernst & Young LLP* (American Arbitration Association) concerning causation and damages due to alleged auditing malpractice, 2006.

*In re: Fannie Mae Securities Litigation*, *Consolidated Civil Action, No. 1:04-cv-1639 (RLJ)* concerning class certification.  2006.

*In re: Dynegy, Inc. Securities Litigation § Master File No. H-02-1571*, concerning causation and damages in connection with shareholder class action, 2006.

Witness statement (with Faten Sabry) *In re: Kerr-McGee Chemical Worldwide LLC et al. v. Kemira Pigments OY et al., Arbitration No. 3439*, on valuation of asbestos liabilities, December 2005.

Due diligence advisory work to value liability exposures from asbestos personal injury claims in Australia, South Africa, U.S. and Europe, May 2005.

United States Senate Committee on the Judiciary, Hearing on Recent Developments in Assessing Future Asbestos Claims Under the Fair Act, work on behalf of National Association of Manufacturers, November 2005.

*Celebrity Cruises Inc. et al., v. Essef Corp., et al., 96 Civ 335 (JCF)*, concerning impact of outbreak of Legionnaires' Disease on enterprise value of cruise ship operator, 2005.

Paul J. Hinton

*In re: Owens Corning, et al.* (United States Bankruptcy Court for the District of Delaware), concerning the estimation of future allowable asbestos claim liabilities, 2004.

Advisory engagement on behalf of pharmaceutical companies, analyzing product liability costs, 2003-2005.

Advisory engagement on behalf of Velsicol Chemical Corporation concerning the valuation product liability insurance rights, 2003.

*In re: Billy and Gayle Blanks, et al. v. NCP Marketing Group, Inc.* (American Arbitration Association ), on damages due to the breach of an agreement, 2003.

*In re: LTV Steel Corporation, Inc., et al., Oil States International, Inc., et al. v. The LTV Corporation* (U.S. Bankruptcy Court for the Northern District of Ohio – Youngstown Division), on trends in asbestos litigation, 2003.

*In re: Allison Ann Kendrick, as Executrix of the Estate of Brian E. Kendrick v. Asbury Automotive Management, LLC, et al.* on the value of services performed by a former CEO of Asbury, on behalf of the executrix of the estate, 2003.

*In re: Vitamins Antitrust Litigation, MDL Mo. 1285, Misc. No. 99-0197 (TFH)* (U.S. District Court for the District of Columbia), concerning causation and damages in connection with vitamin price fixing conspiracies, 2002.

Expert Report in *William H. Wilkerson v. Centura Banks, Inc. et al.* regarding executive compensation, 2002.

*Sorema N. Am. Reins. Co. v. McNeil & Co., Index No. 601483/00* (Sup. Ct., N.Y. County) concerning causation and damages resulting from alleged underwriting deficiencies, 2002.

Advisory engagement *In re Federal-Mogul Global, Inc., et al.,* regarding asbestos liabilities, 2001.

*North American Tea and Coffee, Inc., All Trade Distributors v. United Biscuits (Holdings) PLC. And United Biscuits North America, Inc. Civ. No. 00CV5893 (JBS)* (United States District Court for the District of New Jersey), concerning alleged breach of distribution contract and alleged trademark infringement, 2001.

*Ezell Thomas and Owens Corning v. R.J. Reynolds Tobacco Company, et al.* (Circuit Court of Jefferson County, Mississippi), concerning damages arising from asbestos related diseases, 2000.

*Ashley Creek Phosphate Company v. Chevron U.S.A., Inc.* (United States District Court for the District of Utah - Central Division), concerning market definition, market power, impact on competition and access to essential facilities, 2000.

Paul J. Hinton

*L'Oreal S.A. and Cosmair, Inc., v. Revlon Consumer Products Corp et al.* (United States District Court for the District of Delaware), concerning alleged damages associated with patent infringement, 1999.

*In re: Dow Corning Corporation* (United States Bankruptcy Court for the Eastern District of Michigan Northern Division), concerning the administrative and indemnity cost of liquidating personal injury claims in the Dow Corning Plan of Reorganization, 1999.

*Hugh Collins, et al. v. International Dairy Queen, Inc. and American Dairy Queen Corporation*, No. CA 94-95-4-MAC (WDO), (U.S. District Court for the Middle District of Georgia Macon Division), concerning damages in alleged price fixing case brought by franchisees, 1999.

*Philip Morris Incorporated v. Grinnell Lithographic Co., Inc., Oliver Munson and Les Sutorius*, No. 95 Civ. 0733 (DRH) (U.S. District Court, Eastern District of New York), concerning antitrust damages, 1999.

*Clorox Completes Acquisition of First Brands Corporation,* analysis of competitive effects of acquisition of differentiated products businesses, 1998.

*Tech Spec, Inc. v. THK America, Inc., Case No. 97-10327 BC (Hon. Robert H. Cleland)* (United States District Court Eastern District of Michigan Southern Division), concerning liability and damages due to alleged price discrimination, 1998.

*Guinness PLC, Grand Metropolitan PLC, And Diageo PLC, Docket No. C-3801* (Federal Trade Commission), analysis of competitive effects of horizontal merger of differentiated products businesses, 1998.

California Public Utilities Commission proceeding concerning unbundled network element prices and retail service price floors on behalf of Pacific Bell, 1998.

*CTC Communications v. Bell Atlantic*, No. 97 CV 395 PH, (U.S. District Court for the District of Maine, Southern Division), concerning monopolization of local telephone market and breach of contract with a reseller, 1998.

Georgia Public Service Commission, (Docket No. 6863-U), concerning Bell entry into InterLATA markets, 1997.

Louisiana Public Service Commission, (Docket No. U-22252), concerning Bell entry into InterLATA markets, 1997.

Report, with J. Doublas Zona, "An Analysis on Interexchange Carrier Sent-Paid Payphone Fraud" on behalf of NYNEX, 1997.

In re Fana Holtz, Daniel M. Holtz, Javier J. Holtz and the Holtz Family v. Florida Department of Banking and Finance, Case No. 95-005685, (State of Florida Division of Administrative

Paul J. Hinton

Hearings), *concerning bank performance and impact on factoring business of retail department store failures, 1996.*

*In re: Avon Securities Litigation*, (United States District Court for the Southern District of New York), concerning damages in a class action involving Preferred Equity Redemption Cumulative Stock, 1996.

*Wells Fargo & Company v. First Interstate Bancorp et al. C.A. No. 14696* (Court of Chancery of the State of Delaware in and for New Castle County), concerning alleged market manipulation by First Bank in its buy-back program in the context of a takeover, 1996.

*Norwest Corporation and Subsidiaries v. Commissioner of Internal Revenue, Docket Nos. 20567-93 and 26223-93 (Judge Jacobs)* (United States Tax Court), concerning tax implications of accounting treatment for Brazilian debt-equity swap, 1995.

*Rowe v. Marietta Corporation,* (United States District Court, Western District of Tennessee, Civil Action No. 92-2963 4BRE), concerning alleged 10b-5 damages involving acquisition of a soap company by Marietta, 1995.

*In re ML-Lee Acquisition Fund, II, L.P. and ML-Lee Acquisition Fund (Retirement Accounts) II, L.P. Securities Litigation Consolidated Civil Action No. 92-60 (JJF)* (United States District Court for the District of Delaware), concerning liability, causation and damages, 1994-1995.

August 2009