UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**In Re:**

**Settlement Facility Dow Corning Trust.**

Case No. 00-00005
Honorable Denise Page Hood

_____/

**MEMORANDUM OPINION AND ORDER
REGARDING PARTIAL PREMIUM PAYMENT DISTRIBUTION
RECOMMENDATION BY THE FINANCE COMMITTEE**

**I.   BACKGROUND**

On June 1, 2004, the Amended Joint Plan of Reorganization ("Plan") became effective governing the Dow Corning Corporation ("Dow Corning") bankruptcy matter.  The Court retains jurisdiction over the Plan "to resolve controversies and disputes regarding interpretation and implementation of the Plan and the Plan Documents" and "to allow, disallow, estimate, liquidate or determine any Claim, including Claims of a Non-Settling Personal Injury Claimant, against the Debtor and to enter or enforce any order requiring the filing of any such Claim before a particular date." (Plan, §§ 8.7.3, 8.7.4, 8.7.5)

The Settlement Facility-Dow Corning Trust ("SF-DCT") implements the claims of those claimants who elected to settle their claims under the Settlement Program of the Plan.  (Plan, § 1.131)  The SF-DCT was established to resolve Settling Personal Injury Claims in accordance with the Plan.  (Plan, § 2.01)  The Settlement Facility and Fund Distribution Agreement ("SFA") and Annex A to the SFA establish the exclusive criteria by which such claims are evaluated, liquidated, allowed and paid.  (SFA, § 5.01)  The process for the resolution of claims is set forth under the SFA and corresponding claims resolution procedures in Annex A.  (SFA, § 4.01)

Section 5.05 of the SFA provides that the Debtor's Representatives and the Claimants Advisory Committee ("CAC") may submit joint interpretations and clarifications regarding submissions of claims to the Claims Administrator. The CAC and the Debtor's Representatives entered into a June 11, 2004 Stipulation and Order Establishing Procedures for Resolution of Disputes Regarding Interpretation of the Amended Joint Plan ("Procedures"). If there is a dispute between the Debtor's Representatives and the CAC, the Claims Administrator may resolve the issue or the issue may be raised before the Court by way of a motion pursuant to the June 11, 2004 Procedures. Section 2.01 of the Procedures provides that "these procedures will apply to disputes arising out of the interpretation or application of the Claims Resolution Procedures–Annex A to the Settlement Facility Agreement–and any claims operations functions set out in the Settlement Facility Agreement." (Plan Interpretation Procedures, § 2.01(a))

This matter is before the Court on the Finance Committee's First Amended Recommendation and Motion for Authorization to Make Partial Premium Payments. (Doc. No. 814) The CAC supports the Finance Committee's recommendation. The Debtor's Representatives and Dow Corning's Shareholders, Dow Chemical Co. and Corning, Inc., oppose the Finance Committee's recommendation. A hearing was held on the matter. For the reasons set forth below, the Court accepts the Finance Committee's First Amended Recommendation and grants the request to distribute partial Premium Payments.

**II.   ANALYSIS**

   **A.   Plan Interpretation**

Generally, the provisions of a confirmed plan bind the debtor and any creditor. 11 U.S.C. § 1141(a). In interpreting a confirmed plan, courts use contract principles, since the plan is

2

effectively a new contract between the debtor and its creditors. *In re Dow Corning Corporation,* 456 F.3d 668, 676 (6th Cir. 2006); *see, Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n,* 997 F.2d 581, 588 (9th Cir.1993). State law governs those interpretations, and under long-settled contract law principles, if a plan term is unambiguous, it is to be enforced as written, regardless of whether it is in line with parties' prior obligations. *In re Dow Corning,* 456 F.3d at 676. A term is deemed ambiguous when it is "capable of more than one reasonable interpretation." *Id.* The Court has no authority to modify this language. Although bankruptcy courts have broad equitable powers that extend to approving plans of reorganization, these equitable powers are limited by the role of the bankruptcy court, which is to "guide the division of a pie that is too small to allow each creditor to get the slice for which he originally contracted." *Id.* at 677-78 (quoting *In re Chicago,* 791 F.2d 524, 528 (7th Cir.1986)). "A bankruptcy court's exercise of its equitable powers is cabined by the provisions of the Bankruptcy Code." *Id.* at 678 (citing *In re Highland Superstores, Inc.,* 154 F.3d 573, 578-79 (6th Cir.1998)). New York law governs the interpretation of the Plan. (Plan, § 6.13) Under New York law, a court must first decide whether the contract is ambiguous. *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 595 (6th Cir. 2001).

### B.     Premium Payment Provision

Article VII of the SFA provides four categories of payments:

**7.01** *Timing of Disbursement/Prioritization of Payments.*

**(a)** *Categories of Payment Defined.*

> **(i)** *First Priority Payments.* Payments identified on the Settlement Grid, Annex B hereto, as Expedited Release Payments (for both Settling Breast Implant and Covered Other Products Claims), Explantation Payments, Disease Base Payments (for Breast Implant Claims), Rupture Base Payments (for Breast Implant Claims), Medical Condition

>Payments for Covered Other Products, and Silicone Material Payments, along with related administrative costs, as defined as "First Priority Payments." Payments to be distributed to or for the benefit of Allowed Claims of Settlement Claimants in Classes 4A, 6A, 6B, 6C and 6D, Classes 14 and 15 (as described at Article III), and, to the extent provided in the Litigation Facility Agreement, Litigated Shareholder Claims shall also be defined as First Priority Payments.
>
>**(ii)** *Settlement Fund Other Payments.* Payments for Allowed Claims of Non-Settling Claimants in Classes 11, 13, 14, 14A, 15 and 17 along with related administrative costs shall be defined as Settlement Fund Other Payments and shall be First Priority Payments.
>
>**(iii)** *Second Priority Payments.* Payments identified on the Settlement Grid as "Premium Payments" for Breast Implant Disease Payment Option Claims and Rupture Payment Option Claims and for Covered Other Products Claims and payments for increased severity of disease or disability under Breast Implant Disease Payment Option (for both Disease Payment Option I and Disease Payment Option II) as outlined shall be defined as Second Priority Payments. Payments made to Class 16 Claimants in respect for the obligations in Section 6.16.5 and 16.16.6 of the Plan that are to be paid by the Settlement Facility shall be defined as Second Priority Payments.
>
>**(iv)** *Litigation Payments.* Payments to be distributed to Non-Settling Personal Injury Claims, Allowed Claims of Claimants in Class 12, Assumed Third Party Claims, and, to the extent provided in the Litigation Facility Agreement, Litigated Shareholder Claims along with Litigation Facility Expenses shall be defined as "Litigation Payments."

(SFA, § 7.01(a)) It is the Premium Payments set forth in the Second Priority Payments which are at issue in this motion. Premium Payments allow an extra twenty percent payment to all approved and paid First Priority claimants who meet certain settlement criteria and an extra twenty-five percent payment to all approved and paid First Priority claimants who show that a breast implant ruptured before it was removed from a claimant's body. (Annex B to SFA, Settlement Grid Personal

Injury Claims)  Certain requirements and procedures must be met before the Court may authorize payment of Second Priority Payments under the SFA:

> **7.03** *Requirements/Procedure for District Court Approvals.*
>
> **(a)** *Payment of Second Priority Payments.*  To obtain authorization to distribute Second Priority Payments, the Finance Committee shall file a recommendation and motion with the District Court requesting authorization to distribute Second Priority Payments.  Such recommendation shall be accompanied by a detailed accounting of the status of Claims payments and distributions under the terms of the Settlement and Litigation Facilities, including a detailed accounting of pending Claims and projections and analysis of the cost of resolution of such pending Claims as described in Section 7.01(d).  The recommendation and motion shall be served on the Claimants' Advisory Committee, the Debtor's Representatives, the Shareholders, and all Non-Settling Personal Injury Claimants with pending Claims, and such parties shall have the opportunity to be heard with respect to the motion.  The parties agree to cooperate in expedited procedures for review and resolution of issues under this subsection and consent to an expedited hearing.  If the District Court rules that all Allowed and allowable First Priority Claims and all Allowed and allowable Litigation Payments have been paid *or that adequate provision has been made to assure such payment (along with administrative costs) based on the available assets, then the Second Priority Payments, or some portion thereof, may be distributed*, unless the order of the District Court is stayed or reversed on appeal.  The parties agree that any appeal of an order of the District Court regarding the provisions of this subsection shall be on an abuse of discretion standard.

(SFA, §7.03(a))(italics added).  The SFA provides under § 7.01(c), *Priority of Payment for Claims*:

> **(v)** *Timing.*  Nothing herein shall be interpreted as limiting the discretion of the Finance Committee with the approval of the District Court to pay lower priority payments and higher priority payments *contemporaneously, so long as the ability to make timely payments of higher priority claims is reasonably assured*.

(SFA, § 7.01(c)(v))(italics added).  Premium Payments "may not be distributed *unless and until* the District Court determines that all other Allowed and allowable Claims, including Claims subject to resolution under the terms of the Litigation Facility Agreement, *have either been paid or adequate provision has been made to assure such payments*."  (SFA, § 7.01(c)(iv))(italics added)

The SFA provides for procedures to determine assets available for distribution to claimants

as follows:

> **(d)** *Procedures for Determining Assets Available for Distribution to Claimants.*
>
> **(1)** *Settlement Facility Projections.* In conjunction with the Independent Assessor, the Finance Committee shall, prepare projections of the likely amount of funds required to pay in full all pending, previously Allowed but unpaid and projected future First Priority Payments. Such projections shall, to the extent known or knowable, be based upon and take into account all date (as of the date of the analysis) regarding (i) the number of Claims filed with the Settlement Facility, (ii) the rate of Claim filings in the Settlement Facility (iii) the average resolution cost of Claims in the Settlement Facility, (iv) the pending Claims in the Settlement Facility, and (v) projected future filings with the Settlement Facility. Such projections shall also state the anticipated time period for the resolution and payment of such Claims.

(SFA, § 7.01(d)(1)).

The Funding Payment Agreement provides that the net present value ("NPV") of the Settlement Facility is $2.35 billion. (Funding Payment Agreement, Art. 2.01) The Settlement Fund is allocated $1.95 billion and the Litigation Fund is allocated $400 million. (SFA, § 3.02(a)) The issue before the Court is whether Premium Payments can be distributed at this time within the $2.35 billion NPV and under the Plan's language requirements.

### C. Interpretation of Adequate Provision/Reasonably Assured/Burden of Proof

As required by § 7.03(a) of the SFA, the Finance Committee submitted its motion and recommendation to pay initial Premium Payments, along with a detailed status of Claims payments and distributions under the terms of the Settlement and Litigation Facilities and a detailed accounting of pending Claims and projections and analysis of the cost of resolution of such pending Claims. The Finance Committee recommends a fifty-percent Premium Payment as soon as practicable to Historical Claimants whose claims were paid before January 1, 2011 and another fifty-

percent Premium Payments to Claimant show claims have or will be paid on or after January 1, 2011.

The Finance Committee supports its recommendation with various documents, memoranda and reports from the Independent Assessor, Analysis Research Planning Corporation ("ARPC"), including, among others: the September 22, 2011 ARPC Memorandum Providing Updated Premium Payment Estimates; the September 20, 2011 ARPC Memorandum Regarding its Review of DCT claims filings January through July 2011; Report of Independent Assessor End of Fourth Quarter 2010, Preliminary Report May 20, 2011; June 14, 2011 Memorandum Regarding Estimated Status of Funds Under Certain Assumptions; and, Affidavit of Jean Malone of ARPC. (Doc. No. 814, Exs. J, K, L, M) The Finance Committee supplemented its filings after the hearing with previous Independent Assessor's Reports: Report of Independent Assessor End of Third Quarter 2007 Updated October 2008; Report of Independent Assessor End of Fourth Quarter 2008 Final; Report of Independent Assessor End of Fourth Quarter 2009 Revision 10.01.10. (Doc. No. 870) The CAC submitted a response and the Declaration of Mark Peterson dated March 23, 2011 in support of the Finance Committee's recommendation. (Doc. Nos. 825, 848) The Debtor's Representatives and Dow Corning's Shareholders submitted a response in opposition of the Finance Committee's recommendation with the Declarations of Paul J. Hinton, William Barbagallo and Georgene M. Vairo and other documents. (Doc. Nos. 824, 826-33) Reply and sur-reply briefs were filed.

The Finance Committee argues that the SFA does not place any burden of proof upon the Finance Committee with regard to a Premium Payment recommendation. Instead, the Finance Committee asserts that the Court need only consider the merits of any recommendation and determine whether "adequate provision" has been made to assure payment of First Priority Claims.

7

The Finance Committee further argues that the term "adequate provision" under the SFA does not mean absolute certainty nor does it require a guarantee of a future outcome or solvency, so long as future performance appears "more likely than not," citing *In re M. Fine Lumber Co., Inc.,* 383 B.R. 565, 573 (Bankr. E.D.N.Y. 2008); *In re Natco Indus., Inc.,* 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985); *Enron Power Mktg., Inc., v. Nevada Power Co.,* 2004 WL 2290486, at *6 (S.D.N.Y. Oct. 12, 2004). The CAC supports the Finance Committee's argument.

The Debtor's Representatives and the Shareholders argue that the Plan requires application of the strict "assured" burden of proof standard for authorization of Second Priority Payments, which has not been met by the Finance Committee. They assert that the proposed Premium Payment would violate the Plan, the SFA and Section 1127(b) of the Bankruptcy Code, by establishing new, unequal and discriminatory priority distribution among claimants with Second Priority claims after substantial consummation of the Plan. They further argue that the ARPC Report does not recommend or conclude that the standard for distribution of Second Priority Payments has been met, that the calculations and assumptions on the report have no factual basis and simply extrapolate claims activity for a tiny faction of claimants during a selected 18-month period. These assumptions and extrapolations do not provide "assurance" that all First Priority claims over the remaining years of the Settlement Program will be paid in full, nor do they satisfy even the Finance Committee's suggested standard of "more likely than not." The Debtor's Representatives and the Shareholders argue that under New York law, "assurance of payment" is the equivalent of "guarantee of payment" or "securing payment," citing, *Utilities Eng'g Inst. v. Kofod,* 58 N.Y.S.2d 743 (N.Y. Mun. Ct. 1945); *Nat'l Watch Co. v. Weiss,* 163 N.Y.S. 46 (N.Y. Sup. Ct. 1971); *U.S. v. Jacobs,* 304 F.Supp. 613, 618 (S.D.N.Y. 1969).

In their reply briefs, the Finance Committee and the CAC argue that the Debtor's Representatives and the Shareholders take the term "assure" out of context from the rest of the plan language provision. The Finance Committee states that it is improper to ignore the word "adequate" which appears twice in the SFA Premium Payments provisions, in §§ 7.01(c)(iv) and 7.03(a), and that the opposition omits the modifying language to suggest that payment of First Priority Claims must be "assured" before Second Priority Payments can be made. The Finance Committee and the CAC argue that there is no ambiguity between the term "adequately assured" and the term "assured" since the term "adequately" was used twice in the Premium Payment provision.

The SFA does not limit the Finance Committee's discretion in seeking approval of the District Court "to pay lower priority payments and higher priority payments contemporaneously, so long as the ability to make timely payments of higher priority claims is *reasonably assured*." (SFA, § 7.01(c)(v))(italics added)  By bringing the instant motion, the Finance Committee has determined that it is "reasonably assured" that timely payments will be made to higher priority claims. Because this provision does not limit the Finance Committee's discretion to request contemporaneous payment for both First Priority Payments and Second Priority Premium Payments, the Court finds that under § 7.01(c)(v), the Finance Committee has "reasonably assured" itself that there exists the ability to make timely payments of the First Priority Payments. Any burden of proof the Finance Committee may have under this provision has been met since it has discretion to pay lower and higher priority payments at the same time and it has determined that timely payments to higher priority claims are "reasonably assured." The Court is satisfied that under Section 7.01(c)(v) of the SFA, the Finance Committee has sufficiently determined for itself that payment of higher priority claims is "reasonably assured" and properly requested that Premium Payments be distributed

9

at this time.  (SFA, § 7.01(c)(v))

The provision governing the Court's standard for approving the distribution of Premium Payments under the SFA is set forth in Section 7.01(c)(iv).  The Court is to determine "that all other Allowed and allowable Claims, including Claims subject to resolution under the terms of the Litigation Facility Agreement, *have either been paid or adequate provision has been made to assure such payments*."  (SFA, § 7.01(c)(iv))(italics added)  This Court's interpretation of this provision is that the Court must determine whether there exists "adequate provision" to "assure" First Priority Payments will be made before Premium Payments may be distributed.

The Debtor's Representatives and the Shareholders, argue that in *Utilities Engineering*, the word "assurance" was found to be synonymous with "guarantee."  *Utilities Engineering,* 58 N.Y.S.2d at 745.  The case states that in insurance law, the word "assure" is interchangeable with the word "insure;" in real property documents it means "warranty;" and in business documents it means a "pledge" or "security."  *Id.*  In *National Watch*, the term "assurance" is interpreted as synonymous with "pledge, guaranty, or surety."  *National Watch,* 163 N.Y.S. at 47.  In *Jacobs*, the term "assure" is interchangeable with "secure," "guarantee," or "make certain."  *Jacobs,* 304 F.Supp. at 618.  The Debtor's Representatives and the Shareholders argue that the Finance Committee does not cite any case decided under New York law which supports its interpretation that the phrase "adequate provision" means "more likely than not."  They assert that the Finance Committee's arguments as to the phrase "adequate assurance" are in the context of irrelevant Bankruptcy Code provisions governing assumptions of executory contracts and future performance under those executory contracts which they claim are not relevant in this case.

The Finance Committee argues that the cases it cited are controlling.  Even though the terms

"adequate" and "assure" are separated by the words "provision has been made to," the Finance Committee asserts that the phrase means "*adequate* provision has been made to *assure*" First Priority payments. The Finance Committee asserts that the phrase in between the two terms has no meaningful modification as to the two terms, "adequate assurance." In the *In re Fine Lumber* case, the Finance Committee argues that the term "adequate assurance" was not found to mean an "absolute guarantee of performance." *In re Fine Lumber,* 383 B.R. at 573. The Finance Committee notes in *In re Natco*, the term "adequate assurance of future performance" was not found to mean "absolute insurance," but simply whether payments would be made and that a guaranty was not required. *In re Natco,* 54 B.R. at 436. The *Enron* case cited by the Finance Committee states that a "promise to perform can be an adequate assurance." *Enron,* 2004 WL 2290486 at *6.

The Court finds that the Finance Committee's and the CAC's arguments regarding plan interpretation of the phrases at issue are the more persuasive. It is noted that the cases cited by the Debtor's Representatives and the Shareholders do not construe the term "adequate provision," but only the term "assure." The Debtor's Representatives and the Shareholders' arguments take out of context the term "assure" without taking into context the term "adequate provision" found in the same sentence which governs this Court's determination of whether Premium Payments should be distributed. The term "adequate provision" modifies the term "assure" regarding the manner in which this Court should make its determination of whether to distribute Premium Payments. Applying the Debtor's Representatives and the Shareholders' more stringent interpretation would render the Premium Payments provisions meaningless.

Under New York law, parties are not free to interpret a contract in a way that frustrates the purpose of the contract or that makes any provision of the contract meaningless. *UBS Securities*

*LLC v. Red Zone LLC,* 77 A.D.3d 576, 579, 910 S.Y.2d 55 (2010). The purpose of the Premium Payment provision is to give the Finance Committee the discretion to seek court approval to pay Premium Payments *contemporaneously* with the First Priority Payments if the Finance Committee is "reasonably assured" that there are sufficient funds to distribute both payments. This Court is then to determine whether there is "adequate provision" to "assure" such payments. Applying the more stringent standard argued by the Debtor's Representatives and the Shareholders would render the term "adequate provision" in the SFA meaningless. Although they claim that they are not advocating waiting until all First Priority Payments are paid, waiting until it is "guaranteed" that First Priority Payments will be paid, waiting until there exists a "guaranty" of First Priority Payments is contrary to the purpose of the Premium Payment provision. The Premium Payment provision gives the Finance Committee the discretion to distribute such payments with the Court's approval and upon determination by the Court that there is "adequate provision" to "assure" such payments.

The Court construes the term "adequate provision" as modifying the term "assure" as it relates to the Court's determination to "assure" the payments of First Priority Payments. As noted in *Broadstone Realty Corp. v. Evans,* 251 F.Supp 58 (S.D. N.Y. 1966)(J. Frankel), a breach of contract case which was not cited by any party, the district court in construing the term "adequate provision," noted that "the notion of 'adequate' is a variable one; some things are more adequate than others." *Id.* at 64. Although the cases cited by the Finance Committee do not define the term "adequate assurance" in a contract, the cases define the term as set forth in the bankruptcy statute and are instructive as to how the Court should construe the term as it relates to the Court's determination of whether there are sufficient provisions to also pay the First Priority Payments. The

12

term "adequate assurance" was intended to be given a "practical, pragmatic construction in light of the facts of each case" in the bankruptcy context. *In re Natco,* 54 B.R. at 440. The term does not mean "absolute insurance," but the test is simply whether it appears that payments will be paid and other obligations thereunder met. *Id.* "A guaranty is not required." *Id.* The term is to be construed "to include adequate assurance 'of the source' of payment and other consideration due under the contract. *Id.* The history of payment is relevant. *Id.*

The Court concludes that the term "adequate" or "adequate provision" modifies the term "assure" found later in the sentence, which sentence governs the Court's determination as to whether Premium Payments may be distributed. The term "adequate provision," modifying the term "assure payment," does not mean that payments must be "guaranteed," but only that there exists "adequate provision" for such payments. The term "adequate provision" depends on the facts at hand and the source of such payments. New York courts which have reviewed the term "adequate provision" in a statute noting that there are no particular lines of inquiry for determining the "adequacy" of certain provisions, but courts have generally considered the parties' financial positions and the needs of those involved. *See Barbara N. v. James H.N.,* 62 A.D. 3d 178, 181, 877 N.Y.S.2d at (N.Y.A.D. 1 Dept. 2009) (citing, *Matter of Clara C. v. William L.,* 96 N.Y.2d 244, 250, 727 N.Y.S.2d 20, 750 N.E.2d 1068 (2001)(Reviewing adequacy of support provisions)).

The Court will next review the "adequacy" of the funds available to pay both First and Second Priority Claims below.

### D. Adequacy of Payments

#### 1. Available Assets/Litigation Facility Fund

The Debtor and the Shareholders argue that the Litigation Fund is not an available asset for

13

the Court to consider in determining whether there are sufficient funds to pay First Priority Claims. The Finance Committee and the CAC argue that the Litigation Fund is an asset for the Court's consideration.

The Court interprets the SFA to mean that the Litigation Fund is an asset which the Court can consider in determining whether to distribute Premium Payments based on the express language of the SFA. Section 7.01(b) provides that "Second Priority Payments shall only be made as specified at Section 7.01(c) and/or Section 7.03(a)." (SFA, § 7.01(b)(i)) Before distributing Second Priority Payments, the Court must consider all Allowed and allowable Claims, including "Claims subject to resolution under the terms of the Litigation Facility Agreement." (SFA, § 7.01(c)(iv)) The Finance Committee's recommendation as to Second Priority Payments must be accompanied by a detailed accounting of the Claim payments and distributions under the terms of the Settlement *and* Litigation Facilities. (SFA, § 7.03(a)) In the event that the Settlement Fund lacks sufficient funds in the aggregate to pay in full First Priority Payments, the Finance Committee may file a recommendation with the Court to obtain Litigation Fund assets for payment of First Priority Payments. (SFA, § 7.03(b)) The Finance Committee's projections as to the availability of funds for the payment of Claims subject to the Litigation Fund must include any projected need to access the Litigation Fund for purposes of payment of First Priority Payments under § 7.03(b). (SFA, § 7.01(d)(ii)).

The SFA's express reference to the Litigation Fund assets in the Court's determination of whether Second Priority Payments may be distributed establishes the parties' intention to have the Litigation Fund assets considered in the Court's decision to distribute the Premium Payments. The Finance Committee properly included the Litigation Fund assets in its recommendation to distribute

Premium Payments to the Court.

### 2. Financial Analysis

The Debtor's Representatives and its Shareholders argue that the Independent Assessor's analysis as to the availability of assets is insufficient and that the Court must consider the expert analysis (Fred Dunbar's testimony) submitted at the Confirmation Hearing in June 1999. The Finance Committee and the CAC argue that the SFA only requires the Independent Assessor's analysis for the Court's consideration.

The Court's interpretation of the SFA is that the Independent Assessor's analysis is sufficient documentation for the Court's review in determining whether to distribute Second Priority Payments. The Debtor's Representatives and its Shareholders cannot point to any provision under the SFA which requires financial analysis by an entity, other than the Independent Assessor. The SFA provides that the Finance Committee, "[i]n conjunction with the Independent Assessor" shall "prepare projections of the likely amount of funds required to pay" claims as to unpaid and projected future First Priority Payments and Claims and expenses subject to the Litigation Fund. (SFA, § 7.01(d)(i) and (ii))

Because it is the Finance Committee's responsibility under the SFA to make recommendations to the Court as to whether to distribute Second Priority Payments, the Finance Committee's reliance on the Independent Assessor's projections is proper. The Finance Committee is required to prepare such projections "in conjunction with the Independent Assessor." There is no provision under the SFA that any other party, such as the Debtor's Representatives and the Shareholders, submit any projections or financial analysis to the Court, when the Finance Committee has supported its request to distribute Second Priority Payments.

The Independent Assessor's analysis and Reports are based on actual claims data provided by the Finance Committee, the Settlement Facility and the Financial Advisor. (SFA, §§ 4.05(c), 4.08(b)(ii))  All parties have participated in the Independent Assessor's claims analysis annually pursuant to the Independent Assessor provision agreed to by the parties under the SFA. (SFA, §§ 4.05(c), 4.08(b)(ii))  All parties participated in the selection of the Independent Assessor. (SFA, § 4.05)

Based on the express language in the SFA, the parties intended that the Finance Committee's recommendation to distribute Second Priority Payments be supported by the Independent Assessor's analysis and projections. The Court will not consider the exhibits and expert testimony submitted by the Debtor's Representatives and the Shareholders since the SFA provides that the Court consider the recommendation of the Finance Committee based on the Independent Assessor's analysis and projections. All parties, including the Debtor's Representatives and the Shareholders, have had the opportunity to test and challenge the Independent Assessor's Reports throughout the years, yet no objections have been brought to the Court's attention that the Reports have been misleading or inaccurate.

### 3. Independent Assessor Memoranda and Reports

The Finance Committee asserts there are adequate provisions to pay both First and Second Priority Claims so that 50% initial payment can be distributed for Premium Payments. The CAC argues that the 50% payment is conservative. The Debtor's Representatives and Shareholders argue that the Independent Assessor's reports and memoranda do not contain any conclusion or recommendation regarding the sufficiency of assets to assure payment of First Priority Payments. The Court will now consider whether there is "adequate provision" to assure payment of First

16

Priority Payments in order to distribute Premium Payments based on the Finance Committee's submissions, the Independent Assessor's reports.

The December 31, 2011 quarterly analysis of the Independent Assessor indicates that there is $1.95 billion NPV in the Settlement Fund to pay both First and Second Priority Claims. (12/31/11 ARPC report, p. 61) The June 14, 2011 Memorandum from the Independent Assessor indicates that even assuming Dow Corning would prevail on its claim of approximately $200 million in time value credit, funds would still be available to distribute both First and Second Priority Claims. (6/14/11 ARPC Memorandum) The Sixth Circuit Court of Appeals recently issued an opinion affirming this Court's decision that Dow Corning was not entitled to time value credit, therefore, $200 million may be included in the analysis of whether there are sufficient funds to distribute both First and Second Priority Claims. *See, Dow Corning Corp. v. Claimants' Advisory Comm. (In re Settlement Facility Dow Corning Trust),* No. 11-2632 (6th Cir. Apr. 18, 2013).

The Independent Assessor's projection is that $1.83 billion is required to distribute First Priority Claims. (12/31/11 ARPC report, pp. 66, 88; 6/14/11 and 9/20/11 ARPC Memoranda) The projection used by the Independent Assessor assumes a constant rate of eligible claimants, as opposed to the trend in mass tort settlements where the rate of eligible claimants decreases over time. The projection also assumes that $7.5 million in tissue expander claims and $6.2 million in rupture claims would be paid. (12/31/11 ARPC report, p. 10) The projection takes into account a surge in Claims at the 2014 explant filing deadline and the scheduled end of the Settlement Facility in 2019. (12/31/11 ARPC report, p.25)

The Independent Assessor contemplates 50% Premium Payments to Historical Claimants would cost approximately $69 million NPV. (12/31/11 ARPC report, p. 25) Paying 50% Premium

Payments for Future Claimants would still leave $68 million NPV in the Settlement Fund would remain to pay unanticipated claims. (9/22/11 ARPC memo) After December 2010, the number of disease claims projected is 8,319. Payment of 50% Premium Payments to both Historical and Future Claimants would still leave funds for 6,550 unanticipated disease claims, without exhausting the Settlement Fund. (9/22/11 ARPC Memorandum) These projections indicate that the $400 million Litigation Fund would not be required in order to pay both First Priority and Premium Payments. (9/22/11 ARPC Memorandum)

Based on the Independent Assessor's reports and memoranda submitted by the Finance Committee, the Court finds and concludes that all other Allowed and allowable Claims, including Claims subject to resolution under the terms of the Litigation Facility Agreement have been paid to date, there is more than an adequate provision to assure payments of both First Priority Payments and the Premium Payments recommended by the Finance Committee at 50%.

### III.   CONCLUSION

For the reasons set forth above,

IT IS ORDERED that the Amended Motion for Authorization to Make Partial Premium Payments filed by the Finance Committee **(Doc. No. 814)** is GRANTED.

IT IS FURTHER ORDERED that the Motion for Leave to File Excess Pages filed by Dow Corning **(Doc. No. 824)** is GRANTED.

IT IS FURTHER ORDERED that the Motion for Leave to File Sur Reply filed by Dow Corning **(Doc. No. 858)** is GRANTED.

IT IS FURTHER ORDERED that the Motions for Leave to File Supplemental Declaration filed by the Claimants' Advisory Committee **(Doc. Nos. 865 and 866)** are GRANTED.

IT IS FURTHER ORDERED that the Motion to Seal Exhibit filed by the Finance Committee **(Doc. No. 870)** is GRANTED.

IT IS FURTHER ORDERED that the Finance Committee is authorized to implement the following:

> Fifty-percent (50%) Premium Payments as soon as practicable to Historical Claimants, those whose claims were paid before January 1, 2011, and fifty-percent (50%) Premium Payments to Claimants whose claims have been or will be paid on and after January 1, 2011.

IT IS FURTHER ORDERED that the Finance Committee and the Claims Administrator submit a status report as to the implementation of the above-noted Premium Payments in the usual manner, but no later than the first status conference with the Court in 2014.


S/Denise Page Hood
Denise Page Hood
United States District Judge

Dated: December 31, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 31, 2013, by electronic and/or ordinary mail.

S/Julie Owens
Case Manager