# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In Re:

**Settlement Facility-
Dow Corning Trust.**

                             **Case No. 00-00005
Honorable Denise Page Hood**

_____/

**MEMORANDUM OPINION AND ORDER REGARDING
THE FINANCE COMMITTEE'S MOTION FOR
AUTHORIZATION TO MAKE SECOND PRIORITY PAYMENTS,
THE KOREAN CLAIMANTS' MOTION FOR PREMIUM PAYMENTS
AND
THE KOREAN CLAIMANTS' MOTION FOR ORDER
VACATING DECISION OF THE SETTLEMENT FACILITY
REGARDING ADDRESS UPDATE/CONFIRMATION**

## I.    BACKGROUND

This matter is now before the Court on the Finance Committee's Motion for

Authorization to Make Second Prior Payments filed January 14, 2021.  (ECF No.

1566)  The Claimants' Advisory Committee ("CAC"), the Korean Claimants and the

reorganized Debtor Dow Silicones Corporation (f/k/a Dow Corning Corporation) and

its Representatives (collectively, "Dow Silicones") filed responses and replies to the

Finance Committee's Motion.  The CAC supports the Finance Committee's Motion.

The Korean Claimants and Dow Silicones oppose the Finance Committee's Motion.

Also before the Court is the Korean Claimants' Motion for the initial Premium

Payments to the Korean Claimants filed July 6, 2020. (ECF No. 1545) Dow Silicones and the Finance Committee filed responses to the Korean Claimants' Motion.

On June 1, 2004, the Amended Joint Plan of Reorganization ("Plan") became effective governing the Dow Corning bankruptcy matter. The Court retains jurisdiction over the Plan "to resolve controversies and disputes regarding interpretation and implementation of the Plan and the Plan Documents" and "to allow, disallow, estimate, liquidate or determine any Claim, including Claims of a Non-Settling Personal Injury Claimant, against the Debtor and to enter or enforce any order requiring the filing of any such Claim before a particular date." (Plan, §§ 8.7.3, 8.7.4, 8.7.5)

The Settlement Facility-Dow Corning Trust ("SF-DCT") implements the claims of those claimants who elected to settle their claims under the Settlement Program of the Plan. (Plan, § 1.131) The SF-DCT was established to resolve Settling Personal Injury Claims in accordance with the Plan. (Plan, § 2.01) The Settlement Facility and Fund Distribution Agreement ("SFA") and Annex A to the SFA establish the exclusive criteria by which such claims are evaluated, liquidated, allowed and paid. (SFA, § 5.01) The process for the resolution of claims is set forth under the SFA and corresponding claims resolution procedures in Annex A. (SFA, § 4.01)

On December 31, 2013, the Court entered an Order granting the Finance

Committee's First Amended Recommendation and Motion for Authorization to Make Partial Premium Payments. On January 27, 2015, the Sixth Circuit Court of Appeals reversed the Court's Order finding that the "adequate assurance" standard was not the proper standard for assessing the availability of the funds. The Sixth Circuit adopted Dow Corning's terminology of a "virtual guarantee" to describe the required confidence standard to be applied by the Court. *In re Settlement Facility Dow Corning Trust,* Case No. 14-1090, 592 F. App'x 473, 479-80 (6th Cir. Jan. 27, 2015). The Sixth Circuit also found that the Court in its discretion may consider "competent reports and testimony" challenging the methodology used in determining the availability of the funds. *Id.* at 480-81.

On December 27, 2017, the Court entered an Order granting the Finance Committee's recommendation to issue a fifty percent (50%) Second Priority Payments. (ECF No. 1346) After reviewing the Independent Assessor's Report at that time, the Court found there was adequate provision or a "virtual guarantee" that Allowed and allowable First Priority Claims will be paid based on the available assets even with the distribution of the 50% of the Second Priority Payments. (ECF No. 1346, PageID.21588-89)

The Sixth Circuit affirmed the Court's Order on December 13, 2018, holding that the Court's finding based on the Independent Assessor's projections that all the

first-priority payments were "virtually guaranteed" was not clearly erroneous. *In re: Settlement Facility Dow Corning Trust,* 754 F. App'x 409 (6th Cir. Dec. 13, 2018).

## II.  ANALYSIS

### A.  Plan Interpretation

Generally, the provisions of a confirmed plan bind the debtor and any creditor. 11 U.S.C. § 1141(a).  In interpreting a confirmed plan, courts use contract principles, since the plan is effectively a new contract between the debtor and its creditors. *In re Dow Corning Corporation,* 456 F.3d 668, 676 (6th Cir. 2006); *see, Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n,* 997 F.2d 581, 588 (9th Cir.1993). State law governs those interpretations, and under long-settled contract law principles, if a plan term is unambiguous, it is to be enforced as written, regardless of whether it is in line with parties' prior obligations. *In re Dow Corning,* 456 F.3d at 676.  A term is deemed ambiguous when it is "capable of more than one reasonable interpretation." *Id.*   The Court has no authority to modify this language.  Although bankruptcy courts have broad equitable powers that extend to approving plans of reorganization, these equitable powers are limited by the role of the bankruptcy court, which is to "guide the division of a pie that is too small to allow each creditor to get the slice for which he originally contracted." *Id.* at 677-78 (quoting *In re Chicago,* 791 F.2d 524, 528 (7th Cir.1986)).  "A bankruptcy court's exercise of its equitable powers is cabined by

the provisions of the Bankruptcy Code." *Id.* at 678 (citing *In re Highland Superstores, Inc.,* 154 F.3d 573, 578-79 (6th Cir.1998)). New York law governs the interpretation of the Plan. (Plan, § 6.13) Under New York law, a court must first decide whether the contract is ambiguous. *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 595 (6th Cir. 2001).

## III. Finance Committee's Motion for Authorization to Make Second Priority Payments (ECF No. 1566)

### A. Premium Payment Provision

Article VII of the SFA provides four categories of payments:

**7.01 *Timing of Disbursement/Prioritization of Payments.***

    **(a) *Categories of Payment Defined.***

    **(i) *First Priority Payments.*** Payments identified on the Settlement Grid, Annex B hereto, as Expedited Release Payments (for both Settling Breast Implant and Covered Other Products Claims), Explantation Payments, Disease Base Payments (for Breast Implant Claims), Rupture Base Payments (for Breast Implant Claims), Medical Condition Payments for Covered Other Products, and Silicone Material Payments, along with related administrative costs, as defined as "First Priority Payments." Payments to be distributed to or for the benefit of Allowed Claims of Settlement Claimants in Classes 4A, 6A, 6B, 6C and 6D, Classes 14 and 15 (as described at Article III), and, to the extent provided in the Litigation Facility Agreement, Litigated Shareholder Claims shall also be defined as First Priority Payments.

**(ii)** *Settlement Fund Other Payments.* Payments for Allowed Claims of Non-Settling Claimants in Classes 11, 13, 14, 14A, 15 and 17 along with related administrative costs shall be defined as Settlement Fund Other Payments and shall be First Priority Payments.

**(iii)** *Second Priority Payments.* Payments identified on the Settlement Grid as "Premium Payments" for Breast Implant Disease Payment Option Claims and Rupture Payment Option Claims and for Covered Other Products Claims and payments for increased severity of disease or disability under Breast Implant Disease Payment Option (for both Disease Payment Option I and Disease Payment Option II) as outlined shall be defined as Second Priority Payments. Payments made to Class 16 Claimants in respect for the obligations in Section 6.16.5 and 16.16.6 of the Plan that are to be paid by the Settlement Facility shall be defined as Second Priority Payments.

**(iv)** *Litigation Payments.* Payments to be distributed to Non-Settling Personal Injury Claims, Allowed Claims of Claimants in Class 12, Assumed Third Party Claims, and, to the extent provided in the Litigation Facility Agreement, Litigated Shareholder Claims along with Litigation Facility Expenses shall be defined as "Litigation Payments."

(SFA, § 7.01(a))

The Finance Committee seeks to issue Premium Payments under the Second Priority Payments provision. Premium Payments allow an extra twenty percent payment to all approved and paid First Priority claimants who meet certain settlement criteria and an extra twenty-five percent payment to all approved and paid First Priority claimants who show that a breast implant ruptured before it was removed

from a claimant's body.  (Annex B to SFA, Settlement Grid Personal Injury Claims)

Certain requirements and procedures must be met before the Court may authorize

payment of Second Priority Payments under the SFA:

> **7.03  *Requirements/Procedure for District Court Approvals.***
>
> **(a)  *Payment of Second Priority Payments.***  To obtain authorization to distribute Second Priority Payments, the Finance Committee shall file a recommendation and motion with the District Court requesting authorization to distribute Second Priority Payments. Such recommendation shall be accompanied by a detailed accounting of the status of Claims payments and distributions under the terms of the Settlement and Litigation Facilities, including a detailed accounting of pending Claims and projections and analysis of the cost of resolution of such pending Claims as described in Section 7.01(d).  The recommendation and motion shall be served on the Claimants' Advisory Committee, the Debtor's Representatives, the Shareholders, and all Non-Settling Personal Injury Claimants with pending Claims, and such parties shall have the opportunity to be heard with respect to the motion.  The parties agree to cooperate in expedited procedures for review and resolution of issues under this subsection and consent to an expedited hearing.  If the District Court rules that all Allowed and allowable First Priority Claims and all Allowed and allowable Litigation Payments have been paid or that *adequate provision has been made to assure* such payment (along with administrative costs) based on the available assets, then the Second Priority Payments, or some portion thereof, may be distributed, unless the order of the District Court is stayed or reversed on appeal.  The parties agree that any appeal of an order of the District Court regarding the provisions of this subsection shall be on an abuse of discretion standard.

(SFA, §7.03(a))(italics added).  The SFA provides under § 7.01(c), ***Priority of***

***Payment for Claims***:

**(v)** *Timing.* Nothing herein shall be interpreted as limiting the discretion of the Finance Committee with the approval of the District Court to pay lower priority payments and higher priority payments *contemporaneously, so long as the ability to make timely payments of higher priority claims is reasonably assured.*

(SFA, § 7.01(c)(v))(italics added). Premium Payments "may not be distributed *unless and until* the District Court determines that all other Allowed and allowable Claims, including Claims subject to resolution under the terms of the Litigation Facility Agreement, *have either been paid or adequate provision has been made to assure such payments.*" (SFA, § 7.01(c)(iv))(italics added)

The SFA provides for procedures to determine assets available for distribution to claimants as follows:

**(d)** *Procedures for Determining Assets Available for Distribution to Claimants.*

**(1)** *Settlement Facility Projections.* In conjunction with the Independent Assessor, the Finance Committee shall, prepare projections of the likely amount of funds required to pay in full all pending, previously Allowed but unpaid and projected future First Priority Payments. Such projections shall, to the extent known or knowable, be based upon and take into account all date (as of the date of the analysis) regarding (i) the number of Claims filed with the Settlement Facility, (ii) the rate of Claim filings in the Settlement Facility (iii) the average resolution cost of Claims in the Settlement Facility, (iv) the pending Claims in the Settlement Facility, and (v) projected future filings with the Settlement Facility. Such projections shall also

> state the anticipated time period for the resolution and
> payment of such Claims.

(SFA, § 7.01(d)(1)).  The Funding Payment Agreement provides that the net present value ("NPV") of the Settlement Facility is $2.35 billion.  (Funding Payment Agreement, Art. 2.01)  The Settlement Fund is allocated $1.95 billion and the Litigation Fund is allocated $400 million.  (SFA, § 3.02(a))

In its January 27, 2015 Opinion, the Sixth Circuit rejected this Court's interpretation that the SFA requires an "adequate assurance" of payment and instead adopted Dow Corning's interpretation that the SFA requires "virtual guarantee" of payment.  *In re Dow Corning,* 592 F. App'x at 479-80.  The Court is bound by the Sixth Circuit's "virtual guarantee" standard of confidence as to whether under SFA § 7.03(a), payment should be issued under the Second Priority Payment provision.

## B.    The Finance Committee's Recommendation

The Finance Committee recommends and moves for authorization to distribute Second Priority Payments consisting of:  (1) premium payments to Classes 5, 6.1, 6.2 for Breast Implant Disease and Rupture Payment Option Claims; (2) increased severity of disease or disability to Classes 5, 6.1, 6.2 under the Breast Implant Disease Payment Option; and (3) the remaining 50% payment to Class 16 Claimants.

The Finance Committee submitted the Report of the Independent Assessor

dated December 21, 2020 ("Report 2020") to support its recommendation. (ECF No. 1567, Ex. C) The Independent Assessor estimated the payments of the remaining claims entitled to First Priority Payment in Classes 5, 6.1 and 6.2, in addition to the amount due to Class 16 claimants. The estimate is now based on a fixed number of claims of 62,809 claims eligible for First Priority Payments, since the last deadline to file a claim was June 3, 2019. The Independent Assessor projected that the funds available to fund future trust payments is $649,313,463. The Independent Assessor concluded that there would be a $172,595,097 surplus of funds (in nominal dollars) after paying the First and Second Priority Payments in the estimated amount of $432,239,983 and the estimated administrative expenditures through 2024 in the amount of $30,678,383.

The Finance Committee asserts that the Independent Assessor based its analysis on conservative assumptions that overestimate potential liability for First Priority Payments. The Independent Assessor included claims that had any conceivable chance of receiving payments, such as claims under appeal, claims with incorrect addresses, deficient claims that have not received a Final Determination Letter and claims with returned or stale checks. The Finance Committee argues that historical data from over 15 years of claims processing establishes that a much smaller pool of these claims will actually be eligible for a First Priority Payment.

The Finance Committee further asserts that the Independent Assessor assumed that each claim would receive the maximum payment allowed under the Plan. The Finance Committee claims that for the 2,232 disease claims that have been filed but not reviewed, the Independent Assessor estimated the maximum payment allowed resulting in the amount of $182,591,400. The historical data according to the Finance Committee demonstrates that medical records and other documentation supporting the disease has not supported the maximum severity or corresponding payment levels for all of the claims.

The Finance Committee claims that the Independent Assessor's Second Priority Payments amount include the full amount without reductions for certain funding caps. For example, payment to NOI Claimants for rupture and explant claims is subject to a $30 million funding cap, of which $27,329,141 has been distributed to NOI Claimants. The Finance Committee argues that the remaining balance under the funding cap is insufficient to allow for the nearly $7 million in Second Priority Payments that NOI Claimants could receive absent the funding cap. The Independent Assessor included the $7 million payment in its analysis despite the NOI Claimants' inability to receive this amount.

In light of the Independent Assessor's conservative assumptions that overestimate liability by including unlikely maximum payment levels and an

overinclusive pool of claims, the Finance Committee argues that the estimated $172.6 million funding cushion after the First and Second Priority Payments are distributed, in addition to administrative expenditures are paid, "virtually guarantees" that all First Priority Payments will be made and that the Second Priority Payments are able to be distributed at this time.

The CAC strongly agrees that it is time to approve full Premium Payments and finally fulfill the largest unmet promise to claimants–many of whom have died while waiting for full payment of their claims. While the CAC believes it has been clear for many years that adequate funding exists to pay 100% Premiums, it is now, at the end of the settlement process, beyond any possibility of a good faith dispute that the Settlement Facility can comfortably pay all claims with an immense funding surplus. Dow Silicones' last-minute surge of claims argument is no longer possible because all claim filing deadlines have passed, claims the CAC. The cushion is even larger than the IA's projections, because the approximately $589 million available for qualified transfers to the Trust calculated as of June 1, 2020, will not be drawn until actually needed to pay the claims in 2021 and 2022. The available amount continues to grow at 7% per year, adding millions of additional nominal dollars that will be available, according to the CAC.

The CAC did not expect Dow Silicones to dispute that adequate funding is now

virtually guaranteed, satisfying the only requirement under the Plan to authorize Second Priority Payments and that the payments should be approved forthwith without the delay of a formal hearing. The CAC claims there is no logistical reason to delay processing and issuance of Second Priority Payments, given that it took approximately a year and half to complete processing of 50% Premiums. Any further delay will extend the time line for completing claims processing beyond December 2022, which would increase the cost of operating the Settlement Facility. Approving the Second Priority Payments, the CAC argues, is the best way to ensure the efficient and cost-effective resolution of all remaining claims and of winding up the Settlement Facility and the litigation, which is a goal shared by all parties. The CAC asserts that this step is long overdue to make good on the parties' promise to claimants, who have been waiting literally for decades for full payment and for closure of the Dow Corning "saga," and who to continue to die or lose touch with the Claims Facility as the years go by. As the COVID-19 pandemic continues unabated, with horrific health and economic impacts, the CAC urges that the payment of the final amounts owed to the claimants should be expedited to the greatest extent possible.

### C. Dow Silicones and the Korean Claimants' Opposition

Dow Silicones argues that the lengthy process that involved multiple meeting, inquiries and directives from the Closing Committee to the Settlement Facility to

identify the protocols for identifying claims needing review creates uncertainty about the numbers and types of claims that remain to be finalized. Dow Silicones claims that it does not matter whether the differences are small or large: the fact that there are differences means that there are inconsistencies and anomalies in the data or differences in the data fields used to identify claims. Dow Silicones argues that although the Independent Assessor did not agree to provide a declaration explaining the uncertainties, if asked to testify, Dow Silicones claims that the Independent Assessor would and could only state that there cannot be at this time a 100% guaranty that all pertinent claims have been identified because there so many anomalies in the data.

As an example, Dow Silicones notes that the Report states that all Class 7 claims have been closed. However, the Settlement Facility reports there is one Class 7 claim remaining, while the claims data relied on by the Financial Advisor indicates that there are more than 25 Class 7 claims that remain to be finalized. Dow Silicones recognizes that these specific numbers are small and unlikely to affect the total computation in a material way, but it argues that this illustrates the fundamental uncertainty in the claim information.

Dow Silicones also notes that the parties had learned that over 20,000 rupture claims had been filed without a claim form, but that these claims were eligible for

processing. Dow Silicones further notes that on another occasion, the Settlement Facility had not processed 21,000 MDL Disease Claims as required under the Plan. More recently, Dow Silicones claims that the Settlement Facility could not confirm how certain timing requirements for approximately 5,000 Disease Option 2 claims were applied, which raises the question about the validity of those claims. Dow Silicones argues that history demonstrates the necessity of completing proper due diligence to assure that all claims are fully and finally resolved in accordance with the Plan and that all potential future payments have been identified.

Dow Silicones further argues that the Report does not explain the details of how future administrative costs was calculated. Dow Silicones claims that the Report "purports" to be a projection based on the most recent budget submitted to the Court that then accounts for staff downsizing. However, Dow Silicones claims the Report does not explain when the downsizing is projected to occur or exactly how the numbers are affected. The Report also does not account for projected costs for other events, such as litigation, that could arise before this Court and in other courts, argues Dow Silicones.

Dow Silicones takes issue with how the Report calculated the funding availability because it does not include the backup data for determining the Net Present Value of qualified funding transfers, the methodology for applying the 7%

interest rate for each year, the roll-over of unused Payment Ceilings, or the precise calculation of the conversion of NPV funds to nominal funds. Dow Silicones also takes issue that the funding computation applies a cash balance as of October 31, 2020 while the claims analysis is based on August 31, 2020 data. Dow Silicones argues that without an explanation of the methodology and provision of source data, the Court does not have a proper foundation upon which to evaluate the asserted available funding.

Dow Silicones argues that because the Plan provides for a three-person Finance Committee that operates by majority vote, and, because the Finance Committee consisted of only two members as of February 2020, the decision to recommend distribution of $232 million in assets in the form of Second Priority Payments should be made by a Finance Committee that is fully active and able to support the decision. Dow Silicones also argues that the entire process leading up to the recommendation was "extremely compressed," leaving insufficient time and resources to conduct an appropriate due diligence process. Dow Silicones claims that it did not receive the claims data until November 24, 2020, after it received the draft Report, unlike the past where the parties received the claims data prior to the issuance of the draft Report. The short time frame and the failure to receive the claims data before receiving the draft Report hampered the ability of Dow Silicones to test the Independent Assessor's

analysis. Dow Silicones points to the Plan requirement that provides the parties shall have the ability to be heard, which Dow Silicones claims is meaningless if the parties do not have the tools to present an accurate response to the Court to either dispute or endorse the recommendation.

Dow Silicones asserts that the Finance Committee's statement that distribution of Second Priority Payments now would delay the closure of the Settlement Program to 2022 is not properly supported since the Settlement Facility is fully occupied in processing First Priority claims. Dow Silicones argues that the Plan only authorizes simultaneous distribution of First and Second Priority Payments if the Settlement Facility can continue to make timely First Priority Payments. Any additional tasks by the Settlement Facility aimed at distributing additional Second Priority Payments would affect the timely distribution of First Priority distributions, which would violate the Plan according to Dow Silicones. Dow Silicones and the Debtor's Representatives request that the Court deny the Motion without prejudice for resubmission after the completion of due diligence to determine whether the analysis provides assurance that the First Priority Payments will not be jeopardized in any way by the payment of Second Priority Payments.

The Korean Claimants seek denial of the Motion because they were not served with the recommendation by the Finance Committee. The Korean Claimants do not

want the CAC to act as their agent for the Finance Committee's Motion. The Korean Claimants assert they are not precluded from filing an action as creditors under the Bankruptcy laws and, therefore, they have standing in this Motion. The Korean Claimants requested both the Debtor's Representatives and the CAC take action to object to the Finance Committee's Motion, but the CAC instead supported the Motion.

The Korean Claimants assert that they have been "hurt" by the Finance Committee over the years because the Finance Committee did not act properly under the SFA, the Settlement Program and the Claims Resolution Procedures. The Finance Committee has opposed the Korean Claimants' motions, requests and mediation process through the appeal courts. As a result, the Korean Claimants assert they have suffered, including the waste of time of six years and a lot of expenses. The Korean Claimants claim that the Finance Committee did not reimburse their expenses and costs during the mediation process and that they incurred unnecessary expenses and costs because of the failed mediation process. The Finance Committee also caused the Korean Claimants over a million dollars because the Finance Committee withheld the application for re-categorization of the Korean Claimants from Class 6.2 to Class 6.1 until 2015.

The Korean Claimants further assert that because the Special Master position in the Finance Committee is vacant, the Finance Committee lacks standing in making

the recommendation and any decisions are invalid.  The Korean Claimants argue that the three-member composition requirement is a threshold limitation on the scope of power by the Finance Committee under the SFA and that the provision that the Finance Committee shall act by majority vote would not modify the three-member composition requirement under § 4.08(a) of the SFA.

The Korean Claimants also argue that they have not received the 50% Second Priority Payments approved by the Court based on the Finance Committee's determination that the Korean Claimants' addresses were not updated nor confirmed. This serves as a basis of their objection to the Finance Committee's current recommendation and that they have filed a Motion on this issue.  The Korean Claimants assert that the Finance Committee's Motion would deprive the Korean Claimants of the funds based on the claims still pending before the Settlement Facility.  The Korean Claimants claim that the Independent Assessor's estimation of a $172,595,097 surplus of funds is unreliable because the Korean Claimants have suffered from a long delay of payments by the Settlement Facility.

### D.    The Court's Review

The Plan allows the Court to grant authorization of any Second Priority Payment after a hearing is held and determines that "all Allowed and allowable First Priority Claims and all Allowed and allowable Litigation Payments have been paid *or*

19

*that adequate provision has been made to assure such payment . .."* SFA § 7.03(a).

As the Sixth Circuit ruled, this means that the Court must determine whether it has

been shown that there is a "virtual guarantee" that all First Priority Claims will be

paid before authorizing any Second Priority Payment. The Sixth Circuit noted "this

standard does not require absolute certainty, it is nonetheless stricter than the 'strong

likelihood' or 'more probable than not' levels of confidence that describe 'adequate

assurance.'" *In re Settlement Facility,* 592 F. App'x at 480. The Sixth Circuit noted

that the district court "is correct in that it must make its decision to authorize Second

Priority Payments '*based on* the Independent Assessor's analysis and projections.'"

*Id*. The Court is allowed to consider criticisms of the projections, which the Court

may modify, depending on the evidence developed at the hearing. *Id*. at 481.

The Court again begins its analysis with the Independent Assessor's projection.

The Report indicates that the variable of estimating the value of claims that have not

been submitted to the Settlement Facility has been eliminated because the disease and

expedited release claim submission cutoff date of June 3, 2019 has occurred. (ECF

No. 1567-1, PageID.26239) The Settlement Facility's database (SAM) as of August

31, 2020 was downloaded to the server. Queries were developed identifying pending

claims and methodologies were developed to identify claims Not Started, In Progress,

and eligible for Second Priority Payments. (ECF No. 1567-1, PageID.26240) The

Independent Assessor then researched and resolved data anomalies with the Settlement Facility personnel until the lists of claims by category matched. The selection criteria for including claims in the pending group was expansive, including claims with deficiencies that could be cured, under appeal, with bad addresses, that have not received a Final Determination Letter, and with returned or stale settlement checks. (ECF No. 1567-1, PageID.26243) The Independent Assessor calculated the maximum future payments for each category of pending claims. *Id.* The Independent Assessor coordinated with the Financial Advisor to determine applicable funding amounts available subject to the Funding Agreement and ceilings therein, calculate the amount expended under payment caps, calculate the amount due for Class 16 Second Priority Payment and estimate the Trust administrative expenditures through completion. (ECF No. 1567-1, PageID.26246)

The Report contains both an accounting of prior payments and an analysis of the cost of resolution for pending claims. The pending claims are comprised of only Classes 5 and 6, since Classes 7, 9 and 10 have been closed. The Report indicates there are 62,809 benefit level claims pending for future payments as of August 31, 2020, for a total of $432,239,983 in nominal dollars. (ECF No. 1567-1, PageID.26247)

| Total Pending Claims | | | |
|---|---|---|---|
| Category | Description | Count | Maximum Future Payments |
| In Progress | Disease Premium Payments* | 32,446 | $ 71,635,907 |
| In Progress | Rupture Premium Payments^ | 23,297 | $ 63,600,156 |
| In Progress | In Progress (current/future Closed) | 3,490 | $ 70,039,526 |
| Not Started | Disease Base | 2,232 | $ 182,591,400 |
| Not Started | Increased Severity* | 646 | $ 35,514,600 |
| Returned/Stale Checks | Returned or Stale Checks | 422 | $ 2,088,294 |
| In Progress | Increased Severity* | 201 | $ 5,958,400 |
| Not Started | Expedited | 51 | $ 95,300 |
| In Progress | Participation Pending (Hold Canadian) | 15 | $ 522,400 |
| Not Started | Explant | 5 | $ 25,000 |
| Not Started | Increased Severity (Initial Disease Claim In Progress) | 3 | $ 144,000 |
| Not Started | Rupture | 1 | $ 25,000 |
| **TOTAL** | | **62,809** | **$ 432,239,983** |

*Disease base payment previously issued and cleared

^Rupture base payment previously issued and cleared

(ECF No. 1567-1, Page ID.26257)

The Independent Assessor broke down the $432,239,983 by First Priority, Second Priority Payments and benefit level for the 62,809 pending claims as follows:

| First Priority Maximum Payments for Pending Claims | |
| --- | --- |
| Settlement Payment Option | Base Amount ($) |
| Expedited Release | 2,295,800 |
| Disease | 204,012,072 |
| Increased Severity | N.A. |
| Explantation | 1,209,750 |
| Rupture | 5,710,000 |
| Total | 213,227,622 |

| Second Priority (Premium and Increased Severity) Maximum Payments for Pending Claims | | | |
| --- | --- | --- | --- |
| Settlement Payment Option | Base Amount | Premium Amount | Total ($) |
| Expedited Release | N.A. | N.A. | N.A. |
| Disease - Base Payment Issued and Cleared | N.A. | 71,558,520 | 71,558,520 |
| Disease - No Base Payment Issued | N.A. | 40,809,184 | 40,809,184 |
| Increased Severity Option 1 | 19,341,750 | 4,152,500 | 23,494,250 |
| Increased Severity Option 2 | 14,941,250 | 3,181,500 | 18,122,750 |
| Explantation | N.A. | N.A. | N.A. |
| Rupture - Base Payment Issued and Cleared | N.A. | 63,600,156 | 63,600,156 |
| Rupture - No Base Payment Issued | N.A. | 1,427,500 | 1,427,500 |
| Total | 34,283,000 | 184,729,360 | 219,012,360 |

| First and Second Priority Maximum Payments for Pending Claims | | | |
| --- | --- | --- | --- |
| Settlement Payment Option | Base Amount | Premium Amount | Total ($) |
| Expedited Release | 2,295,800 | N.A. | 2,295,800 |
| Disease | 204,012,072 | 112,367,704 | 316,379,776 |
| Increased Severity Option 1 | 19,341,750 | 4,152,500 | 23,494,250 |
| Increased Severity Option 2 | 14,941,250 | 3,181,500 | 18,122,750 |
| Explantation | 1,209,750 | N.A. | 1,209,750 |
| Rupture | 5,710,000 | 65,027,656 | 70,737,656 |
| Total | 247,510,622 | 184,729,360 | 432,239,983 |

(ECF No. 1567-1, PageID.26248)

The total projected remaining funding available to the Settlement Facility as of October 31, 2020 based on the Financial Advisor is $649,313,463, which includes cash and investment balance as of October 31, 2020 of $59,980,422 and projected available funding under payment ceilings as of June 1, 2020 of $589,333,041. (ECF No. 1567-1, PageID.26248) The Independent Assessor noted that there is an alternative calculation for the projected available funding of $602,301,567, but that the lower figure of $589,333.041 was used in the Report.

The Independent Assessor concluded that considering the estimated future payment of $432,239,983, there are sufficient available funds to pay Ordered late claimants, increased severity payments, Premium Payments, administrative expenditures and the additional 50% Class 16 payment, with the remaining projected funds available of $172,595,097:

| Total Projected Funds Available to Fund Future Trust Payments | $ 649,313,463 |
| Projected Maximum First and Second Priority Payments | $ (432,239,983) |
| Administrative Expenditures | $ (30,678,383) |
| Projected 2nd 50% Class 16 Payment - 12/31/2020 | $ (13,800,000) |
| **Remaining Projected Funds Available** | $ 172,595,097 |

(ECF No. 1567-1, PageID.26249)

Neither Dow Silicones nor the Korean Claimants argue that the Independent

Assessor's conservative and overinclusive methodology in estimating the remaining unpaid claims is improper. Dow Silicones argues that more due diligence must be performed to make sure that the remaining claims are properly verified. Dow Silicones does not argue that the 62,809 pending claims is not a "good" number or how many more claims are pending above that number, in light of the June 3, 2019 final deadline. As the parties are well aware, through the years, the Independent Assessor's numbers have been on the conservative side. Dow Silicones makes no argument that the Independent Assessor's conclusion, given the pending claims and the overinclusiveness and maximum payment calculations, should not result in a finding that First Priority Payments are virtually guaranteed, even with the Second Priority Payments.

As to Dow Silicones' argument that the Settlement Facility must focus on First Priority claims and that distribution of Second Priority Payments would delay the First Priority Payments does not take into account that Second Priority Payments have already been paid, while also "focusing" on First Priority claims. The Settlement Facility has been able to process both First Priority and Second Priority Payments in the past.

Both Dow Silicones and the Korean Claimants argue that the Motion should be denied because the Finance Committee was not acting at full capacity of three

members, even though at all times, there were at least two members agreeing to the recommendation before the Court. In any event, the Court has now appointed a Special Master (along with a Successor Claims Administrator). No member of the Finance Committee has raised any objection to the instant recommendation. Any argument that the Finance Committee is not acting in full capacity is moot.

Dow Silicones further argues that its right to be "heard" is meaningless since the process was compressed. Dow Silicones, as all the parties know, that the final deadline to submit claims was June 1, 2019, and in light of the years long litigation of Premium Payments, Dow Silicones could have anticipated that the Finance Committee was going to move for Second Priority Payments soon thereafter the deadline. Dow Silicones' opportunity to be "heard" has not been impaired since it had access to the numbers used by the Independent Assessor as the Finance Committee. Even if the actual numbers used by the Independent Assessor was not received by Dow Silicones until November 2020, the previous numbers given to all the parties have been in some form from monthly reports by the Settlement Facility and the Financial Advisor.

The Korean Claimants' argument that they have standing in opposing the Finance Committee's recommendation since they are in fact a Settling Personal Injury Claimants under the SFA. The Korean Claimants did not choose to litigate their

claims under the Litigation Facility, but instead to settle their claims under the SFA. As noted by the Korean Claimants in their brief, some of their grievances have been resolved by this Court and the Sixth Circuit of Appeals.

The Court finds that the Finance Committee has properly supported its recommendation and motion for authorization to distribute Second Priority Payments based on the Independent Assessor's conclusion that the estimated future payment of $432,239,983, there are sufficient available funds to pay First Priority Payments, with the remaining projected funds available of $172,595,097. The Court further finds there is adequate provision or a "virtual guarantee" that Allowed and allowable First Priority Claims will be paid based on the available assets. The Court authorizes the Second Priority Payments as recommended by the Finance Committee.

IV.  **Korean Claimants' Motion for Premium Payments (ECF No. 1545, filed 7/6/2020) and Korean Claimants' Motion for Order Vacating Decision of the Settlement Facility Regarding Address Update/Confirmation (ECF No. 1569, filed 1/15/2021)**

The Korean Claimants seek an Order directing the Settlement Facility to pay them Premium Payments. The Korean Claimants argue that the requirement to confirm current addresses was done, but were not verifiable because several letters were returned to the Settlement Facility and that counsel was no longer trusted as the attorney for the Korean Claimants by the Settlement Facility. The Korean Claimants assert that the Settlement Facility has the duty and obligation to pay the premium

payments.

Dow Silicones and the Finance Committee oppose the motion arguing that the mandatory procedures require that current addresses for claimants must be confirmed. Historically, numerous award letters were returned as undeliverable and it was unclear whether a claimant had knowledge that a payment had been issued to the claimant's counsel. As to the Korean Claimants, several address verification mailings sent to them have resulted in a 40-50 percent return rate. Numerous attempts have been made to obtain address information. Counsel for the Korean Claimants disputes his obligation to provide address verification.

The Settlement Facility has issued payments to those Korean Claimants who have properly responded to address verification. However, as to those with addresses that cannot be verified, the Settlement Facility has not made payments to those claimants, but upon verification will do so.

Dow Silicones and the Finance Committee also argue that this motion is improper in that it is essentially an "appeal" from any decisions made by the Claims Administrator or an improper reconsideration motion of the Court's Closing Order No. 2 regarding address verification.

On March 19, 2019, the Court entered Closing Order No. 2 which includes protocols "designed and intended to authorize the SF-DCT to take actions to ensure

that Settlement Fund payments are distributed to claimants as required by the Plan." (ECF No. 1482, Closing Order 2, at ¶ 7) These procedures apply to all payments – including Premium Payments. Closing Order 2 prohibits the Settlement Facility from issuing payments to claimants who cannot be located. The Settlement Facility cannot issue payments to or for claimants or an authorized payee unless the Settlement Facility has a confirmed a current address for such claimant or authorized payee. A confirmed current address means an address that has been verified as a mailing address where the claimant or authorized payee is receiving mail so that the Settlement Facility is able to verify that the claimant or authorized payee will actually receive the mailed check. This requirement applies both to claimants who are unrepresented and claimants who are represented and whose payment check might be mailed to the claimant's attorney. (Closing Order 2, at ¶ 11)

The Korean Claimants did not appeal this Order to the Sixth Circuit of Appeals. The Settlement Facility is bound by this Order and if it cannot properly verify a claimant's address as required by this Order, then no payment is authorized to issue to any claimant whose address cannot be verified. The Korean Claimants has no authority to appeal any determinations by the Claims Administrator regarding payment if the Claims Administrator and/or the Settlement Facility is not authorized to issue any payment if the requirement in Closing Order No. 2 is not followed.

The Korean Claimants' Motion for Premium Payments is denied as to those Claimants whose address cannot be verified as required by Closing Order 2. In light of this ruling, the Korean Claimants' Motion for Order Vacating Decision of the Settlement Facility Regarding Address Update/Confirmation is denied because the Settlement Facility has no authority to issue payments if the requirements of Closing Order 2 is not met. As noted above, the Korean Claimants have no authority to appeal any decision made by the Settlement Facility regarding address update and confirmation requirements.

## V.    CONCLUSION AND ORDER

For the reasons set forth above,

IT IS ORDERED that the Finance Committee's Motion for Authorization to Make Second Priority Payments **(ECF No. 1566, filed 1/14/2021)** is **GRANTED** as more fully set forth above.

IT IS FURTHER ORDERED that the Korean Claimants' Motion for Premium Payments **(ECF No. 1545, filed 7/6/2020)** is **DENIED** if addresses are not able to be verified as required by Closing Order No. 2.

IT IS FURTHER ORDERED that the Korean Claimants' Motion for Order

Vacating Decision of the Settlement Facility regarding Address Update/Confirmation **(ECF No. 1569, filed 1/15/2021)** is **DENIED**.

IT IS FURTHER ORDERED that the Joint Motion to Seal Response the Declaration of D. Greenspan and Exhibits **(ECF No. 1582, filed 1/27/2021)** is **GRANTED**.

S/DENISE PAGE HOOD
DENISE PAGE HOOD
Chief United States District Judge

DATED: June 24, 2021