## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

IN RE: SETTLEMENT FACILITY -
DOW CORNING TRUST,

Case No. 00-00005

SETTLEMENT FACILITY MATTERS.

Hon. Denise Page Hood

_____/

## ORDER GRANTING MOTION TO TERMINATE FUNDING PURSUANT TO SECTION 2.01(c) OF THE FUNDING PAYMENT AGREEMENT AND TO TERMINATE THE SETTLEMENT FACILITY PURSUANT TO SECTION 10.03 OF THE SETTLEMENT FACILITY AND FUND DISTRIBUTION AGREEMENT (ECF No. 1796)

## I.    BACKGROUND/FINDINGS OF FACT

This matter is before the Court on a Motion to Terminate Funding Pursuant to Section 2.01(c) of the Funding Payment Agreement and to Terminate the Settlement Facility Pursuant to Section 10.03 of the Settlement Facility and Fund Distribution Agreement filed by Dow Silicones Corporation (formerly known as Dow Corning Corporation), the Debtor's Representatives and the Finance Committee ("Movants"). The Claimants' Advisory Committee ("CAC") supports the Motion but seeks to defer the termination until the appeals filed by the Korean Claimants' and the CAC's fee request are resolved. The Korean Claimants oppose the Motion and again seek payment for their claims. A hearing was held on the matter on December 11, 2024.

On June 1, 2004, the Amended Joint Plan of Reorganization ("Plan") became effective governing the Dow Corning bankruptcy matter.  The Court retains jurisdiction over the Plan "to resolve controversies and disputes regarding interpretation and implementation of the Plan and the Plan Documents" and "to allow, disallow, estimate, liquidate or determine any Claim, including Claims of a Non-Settling Personal Injury Claimant, against the Debtor and to enter or enforce any order requiring the filing of any such Claim before a particular date." (Plan, §§ 8.7.3, 8.7.4, 8.7.5)

The Settlement Facility-Dow Corning Trust ("SF-DCT") implements the claims of those claimants who elected to settle their claims under the Settlement Program of the Plan.  (Plan, § 1.131)  The SF-DCT was established to resolve Settling Personal Injury Claims in accordance with the Plan.  (Plan, § 2.01)  The Settlement Facility and Fund Distribution Agreement ("SFA") and Annex A to the SFA establish the exclusive criteria by which such claims are evaluated, liquidated, allowed, and paid.  (SFA, § 5.01)  The process for the resolution of claims is set forth under the SFA and corresponding claims resolution procedures in Annex A. (SFA, § 4.01)

The SF-DCT was funded under The Funding Payment Agreement ("FPA") which provided that the Debtor fund

> payments to the Settlement Facility up to a maximum aggregate amount of $3,172,000,000, subject to adjustment as described in this Agreement in order to achieve a net present value of $2,350,000,000 compounded annually as of the Effective Date after applying a discount rate of 7% per annum.

(FPA, § 2.01) There were 16 Funding Periods, with Annual Payment Ceilings, which commenced on the first anniversary of the June 1, 2004 Effective Date of the Plan. (FPA, § 2.01(b)) Section 2.01(c) provides that the Debtor's

> obligation to fund up to the amount of the applicable Annual Payment Ceiling shall continue until the earlier of (i) the date when all Allowed Claims in each of Classes 5 through 19 and all other obligations of the Settlement Facility and the Litigation Facility have been paid, all Claims filed have been liquidated and paid or otherwise finally resolved, and no new timely Claims have been made against the Settlement Facility or the Litigation Facility for two consecutive Funding Periods; or (ii) the payment of all amounts required by this Agreement.

(FPA, § 2.01(c))

> The SFA provides that the SF-DCT,

> shall terminate as soon as practicable after the Reorganized Dow Corning's obligation to fund under the Funding Payment Agreement is terminated in accordance with Section 2.01(c) of the Funding Payment Agreement. The Claims Administrator will use his or her best efforts to substantially complete and terminate the Settlement Facility and Trust within sixty (60) days after such termination of the Funding Payment Agreement. The Claims Administrator shall seek an order from the District Court confirming that it is appropriate to terminate the Settlement Facility.

(SFA, § 10.03(a)) After the termination of the SF-DCT,

the Claims Administrator shall remain authorized to wind up the affairs of the Settlement Facility and the Trust, and thereafter, the Claimants' Advisory Committee shall be authorized to dispose of the balance, if any, of funds in the Settlement Facility after payment of or adequate provision for any remaining Settlement Facility or Trust expenses. Any such funds shall be distributed, if cost effective, pro rata to the holders of Allowed Claims previously paid to Claimants eligible under this Agreement by the Settlement Facility, or, if such distribution would not be cost effective, to a neutral medical research institute or university, selected by the Finance Committee after consulting with the Claimants' Advisory Committee.

(SFA, Art. 10.03(b))

The SF-DCT's Claims Administrator, Kimberly Smith-Mair, submitted a Declaration in support of the Motion. She states,

> 7. I have reviewed the Settlement Facility records and I can confirm, based on those records, that (1) all Allowed Claims in each of Classes 5 through 10 and all other obligations of the Settlement Facility have been paid, (2) all Claims filed have been liquidated and paid or otherwise finally resolved, (3) no new timely Claims have been made against the Settlement Facility since June 3, 2019 - which was the final deadline for submission of Disease Claims, and ( 4) on February 5, 2005 the Settlement Facility mailed notices to 4,926 Class 12 physicians and Class 13 Health Care Providers. For purposes of this Declaration, the phrase "all other obligations of the Settlement Facility" includes payment of all Fundable Expenditures, which are basically administrative expenses of operations as authorized by the budget approved by the Court.

> 8 I, along with various staff and consultants, and in conjunction with Independent Assessor, conducted a due diligence process for the purpose of assuring that all timely claims in Classes 5, 6, 6.1, 6.2, 7, 9, 10, 10.1 and 10.2 have been processed and have received a notification of status letter as required by the SF A.

4

> Based on that process, I confirm that all eligible claimants who complied with the deadlines imposed by the Plan and procedures required by Court Order were sent a payment check. I note that some claimants did not cash their payment checks but such claimants were provided opportunities to seek a reissued check up until the deadline for reissuance imposed by Court Order.

(ECF No. 1796, PageID.42626)  Smith-Mair further states that the staff at the SF-DCT has been reduced, with further reductions planned at the end of 2024.  The office space lease was terminated at the end of June 2-24.  *Id*.  Smith-Mair anticipates that it will take fewer than 90 days following an Order terminating funding to complete and terminate the Settlement Facility.  *Id*.  If the Motion to Terminate is approved by the Court prior to the end of December 2024, Smith-Mair anticipates that the costs of completing and terminating the Trust within this 90-day period is within the amount remaining in the SF-DCT account.  However, Smith-Mair states that if the wind-down activities extend beyond the end of March 2025, additional funding may be required.  *Id*.

The Declaration of the Financial Advisor, Brian Chmiel, was also submitted in support of the Motion.  He confirms that the SF-DCT issued the final claim payment checks in August 2024, and that, except for one uncashed claim payment, all other claim checks have either been cashed or expired.  (ECF No. 1796, PageID.42459)  Chmiel asserts that as to uncashed claim payment, there is

sufficient available funds in the clam bank account if the claim payment was to be

cashed.  *Id.*  He confirms that all payments due pursuant to the Quebec Breast

Implant Settlement Agreement, the Ontario Breast Implant Settlement Agreement,

the B.C. Class Action Settlement Agreement, and the Australia Breast Implant

Settlement Option were made.  *Id.*  Chmiel further states:

> 7      As Financial Advisor, I confirm that all payments due for
> Class 14 under the Domestic Health Insurer Settlement Agreement
> have been made as part of the Effective Date payments.
>
> 8      As Financial Advisor, I confirm that all payments due for
> Class 15 Government Payor Claims have been made as part of the
> Effective Date payments.
>
> 9      As Financial Advisor, I confirm that a 50% Class 16
> payment in the amount of $12,741,395 was remitted on June 7, 2019.
>
> 10     As Financial Advisor, I confirm that on December 31,
> 2021, in conjunction with the Court Order approving the 2nd 50% of
> Second Priority Payments, the Trust recorded $14,073,724 in Claims
> Payable for the 2nd 50% Class 16 payment to be remitted to the Dow
> Chemical Company, subject to the terms of the funding agreement.

*Id.*

Chmiel asserts that the Allowed administrative costs have been paid or that

provision has been made to make such final payments as authorized by the Court.

He states that the investment managers have completed their tasks and have been

discharged.  Chmiel further states that once the uncashed check is presented or

expired, the claim bank account will be closed.  He confirms that the bank account

for the payment of administrative expenses will be closed upon completion of any wind-down activities authorized by the Court. A final audit and tax return for the SF-DCT will be completed at the conclusion of the wind-down process. *Id*. Chmiel asserts that the amounts remaining in the SF-DCT account and budget are sufficient to cover the costs to pay all amounts to complete and terminate the Trust if the Motion to Terminate is approved before the end of December 2024 and the wind-down is completed by March 2025. If the wind-down extends beyond the end of March 2025, additional funding may be required. *Id*. at PageID.42460.

John Wills, the Independent Assessor, also submitted a Declaration. He asserts:

> 5.    In the course of my consulting work and my Independent Assessor work I obtained detailed knowledge of the claim data, the operations of the SF-DCT, the terms of the funding, and the likely required funding to complete the evaluation and payment of eligible claims.
>
> 6.    In these capacities, I participated in and assisted with the development of comprehensive groupings of claims data to assure that each claim had been addressed as required by the Plan. I assisted in the preparation of data analysis and reports showing – at various stages – the universe of claims and their status as eligible, ineligible, paid, resolved, and closed.
>
> 7.    I have analyzed the current claims data using the procedures that I have employed in the past. That data shows that all proofs of claims filed in the bankruptcy case were transmitted to the SF-DCT as required by the Plan, that the SF-DCT has evaluated each claim and has provided each claim with a determination of either

eligible or deficient. A claim can be deficient if it does not have the supporting documentation to support a benefit payment, or if it is not timely, or if the claimant fails to correct a deficiency by the applicable deadline.

(ECF No. 1796, PageID.42633)

Wills also asserts that he analyzed recent financial statements and claim data and that,

> [b]ased on the claim and financial data, I conclude as Independent Assessor that all timely claims that are eligible for payment and that have met the requirements established by the Court for payment have been sent a payment. I conclude that there are no pending outstanding claims remaining to be paid. Claims that did not receive payment were not eligible for payment under the terms of the Plan and/or the applicable Court orders governing the procedures for payment. There is no further need for claim review staff or claim payment staff.

*Id*. After analyzing the budget and current Fund balance, Wills concludes that "the remaining Fund balance is sufficient to complete the wind-down of operations over a reasonable period of time. I have been advised that the staff has already been reduced, and that the office space lease was terminated at the end of June 2024. Accordingly, I see no need for any further funding." *Id*. at PageID.42634.

## II.   ANALYSIS

### A.   Plan Interpretation

Generally, the provisions of a confirmed plan bind the debtor and any creditor.  11 U.S.C. § 1141(a).  In interpreting a confirmed plan, courts use

8

contract principles, since the plan is effectively a new contract between the debtor and its creditors. *In re Dow Corning Corporation,* 456 F.3d 668, 676 (6th Cir. 2006); *see, Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n,* 997 F.2d 581, 588 (9th Cir.1993). State law governs those interpretations, and under long-settled contract law principles, if a plan term is unambiguous, it is to be enforced as written, regardless of whether it is in line with parties' prior obligations. *In re Dow Corning,* 456 F.3d at 676. A term is deemed ambiguous when it is "capable of more than one reasonable interpretation." *Id.* The Court has no authority to modify this language. Although bankruptcy courts have broad equitable powers that extend to approving plans of reorganization, these equitable powers are limited by the role of the bankruptcy court, which is to "guide the division of a pie that is too small to allow each creditor to get the slice for which he originally contracted." *Id.* at 677-78 (quoting *In re Chicago,* 791 F.2d 524, 528 (7th Cir.1986)). "A bankruptcy court's exercise of its equitable powers is cabined by the provisions of the Bankruptcy Code." *Id.* at 678 (citing *In re Highland Superstores, Inc.,* 154 F.3d 573, 578-79 (6th Cir.1998)).

New York law governs the interpretation of the Plan. (Plan, § 6.13) Under New York law, a court must first decide whether the contract is ambiguous. *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 595 (6th Cir. 2001). If a court

determines that language of a contract is ambiguous, external evidence of the parties' intent is admissible. *Id.* The court is to give effect to the intent of the contracting parties as revealed by the language they chose. *Id*. at 596. The Court has reviewed the Plan documents and various applicable Orders it entered in this matter. Based on the arguments and supporting documents presented by the parties, the Court has interpreted the Plan and related documents, as more fully set forth below.

### B. Korean Claimants' Arguments

The Korean Claimants argue that the conditions for termination have not been met since certain Korean Claimants have not received payment. The Movants replies that the Plan does not condition termination on receipt of payment by every claimant since under the Plan, not all claims are eligible for payment.

As this Court previously ruled and as affirmed by the Sixth Circuit Court of Appeals, this Court has no authority under the Plan documents to review the denial of Claims by the Claims Administrator. The Sixth Circuit has noted that "[t]o the extent the Korean Claimants seek to challenge any substantive decisions of the Claims Administrator with respect to any particular claims, such review is beyond the scope of the plan." *In re Settlement Dow Corning Trust*, Case No. 18-1040, 760 F. App'x 406, 411-12 (6th Cir. Jan. 14, 2019).

The FPA in Section 2.01(c) provides the Debtor's obligation to fund the SF-DCT terminates when "all Claims filed have been liquidated and paid *or otherwise finally resolved*."   The express language of the FPA does not support the Korean Claimants' position that because they have not been paid, the FPA cannot be terminated.   The Claims by certain Korean Claimants were "otherwise finally resolved" by the Claims Administrator's denial of those certain claims and the Sixth Circuit's ruling that the Korean Claimants' challenge to such denial was beyond the scope of the Plan.   The Korean Claimants did not appeal the Sixth Circuit's ruling to the Supreme Court.   Orders and judgments become final when "the availability of appeal has been exhausted and lapsed, and the time to petition for certiorari has passed."  *Deja Vu v. Metro. Gov't of Nashville & Davidson Cnty., Tennessee*, 421 F.3d 417, 421 (6th Cir. 2005).  The Court finds that the FPA can be terminated even if certain Claims were not paid because they were denied by the Claims Administrator and thereby "otherwise finally resolved."

The Korean Claimants further argue that because they continue to make "demands of payments" on their unpaid claims which were denied, the FPA cannot be terminated. They also argue that as a result of the request for updated addresses by the SF-DCT, when the updated addresses were provided, these then became

"new claims."  The Movants reply that continued "demands of payments" do not "magically" resurrect claims that have been denied and closed.

Section 2.01(c) of the FPA also conditions termination if "no new timely Claims have been made against the Settlement Facility or the Litigation Facility for two consecutive Funding Periods."  (FPA, § 2.01(c)) The Korean Claimants' Claims are not "new" because the Claims were previously denied.  Any "demands of payments" submitted does not make the denied Claims "new" Claims since they constitute the same Claims which were previously denied by the Claims Administrator.  The request for updated addresses does not make the Korean Claimants' Claims "new" Claims since the requests for updated addresses was ordered by the Court in Closing Order 2 on March 19, 2019.  Nothing in Closing Order 2 supports the Korean Claimants' argument that providing updated addresses turns a claim which was previously filed with the SF-DCT into a "new" Claim.

As to the Korean Claimants' position that the funding periods were extended, as the Movants argue, the FPA specifically set forth the Funding Periods.

The FPA provided for 16 Funding Periods, with Annual Payment Ceilings, which commenced on the first anniversary of the June 1, 2004 Effective Date of the Plan, ending on June 1, 2021.  (FPA, § 2.01(b)) The Korean Claimants cannot

point to any provision under the Plan documents, nor any order that extended the Funding Period.   Pursuant to the plain language of the FPA, the 16 Funding Periods ended on June 1, 2021.

As to the Korean Claimants' renewed request for payment of Claims which were previously denied, the Court will again deny this request based on its previous Orders, and the Sixth Circuit's ruling on this issue, as set forth above.

### C.   The CAC's Arguments

#### 1.   Korean Claimants / Otherwise Finally Resolved

The CAC argues that the Korean Claimants' Appeal has not been resolved. However, as noted above and as ruled on by the Sixth Circuit, this Court lacks authority under the Plan documents to review the Claims Administrator's decision to deny a claim.   The current appeal by the Korean Claimants involves Closing Order 5, which provided that the Claims Administrator close Claims where the claimants failed to update addresses.   The Court noted the Sixth Circuit's Order that the Korean Claimants' appeal as to Closing Order 5 was untimely.   See, ECF No. 1783, PageID.41110.   The current appeal by the Korean Claimants does not change the Plan documents' language that there is no right to appeal a denial by the Claims Administrator, as this Court and the Sixth Circuit have previously ruled. Section 2.01(c) provides the Debtor's obligation to fund the SF-DCT terminates

when "all Claims filed have been liquidated and paid *or otherwise finally resolved*." The Claims Administrator's denial of the Korean Claimants Claims meets the criteria under the FPA that Claims are "otherwise finally resolved" since the Korean Claimants' Claims currently before the Court were not liquidated or paid. The Korean Claimants' Claims were "otherwise finally resolved" by the denial because there is no right to appeal from the Claims Administrator's decision.

### 2.   CAC's Request for Compensation

Regarding the CAC's request for compensation and the reasonable hourly rate issues before the Court raised in the CAC's response to the Movants' motion to terminate funding, the Movants argue in their reply that any such request should be made through the budget process and that an accounting of the CAC's request should be made available. The Movants assert that they were previously unaware the CAC had made a request for additional compensation to the Court. The CAC filed a sur-reply asserting that the Movants' reply raised "new claims" as to the request for accounting and that if the Movants appeared to be surprised by the CAC's compensation request, it is a surprise of their own making.

The Court finds an accounting is not required. The Movants are well aware of the amount of compensation the CAC has received throughout the years,

through the budget process and based on the various financial reports the parties receive as required by the SFA.  SFA, Art. VIII.

As to the CAC's compensation request in addition to what the CAC has received throughout the years, the Court finds that based on the Movants' response, they appeared surprised at the request for *additional* compensation.  The Court agrees that the CAC's submissions as to their monthly request for compensation are reviewed by the Court ex parte.  However, the request for additional fees to fully compensate the CAC based on past work, is a different and new request than the normal monthly request for fees based on work the CAC already performed and on the approved hourly rates entered by the Court.

The SFA provides that the CAC members shall be compensated by the Settlement Facility at reasonable hourly rates established by the District Court. (SFA, § 4.09(d)) The Order Establishing Compensation for Claimants' Advisory Committee provides that the "CAC members have voluntarily agreed for purposes of conserving the assets of the Settlement Fund to reduce their normal hourly billing rate."   (ECF No. 39, PageID.125) However, nothing in this Order, nor the SFA, provides for retroactive compensation for the CAC.  As stated in the Order, the CAC "voluntarily agreed for purposes of conserving assets of the Settlement Fund to reduce their normal hourly billing rates." *Id*.

The Court finds this was a generous act on the part of CAC members.  There is no doubt that the CAC's work through the years, especially at the beginning of the SF-DCT resulted in claimants receiving appropriate compensation and aided in preserving Trust assets.  The CAC members' work shows that they placed the Claimants' interests first.  The CAC could have requested an increase in their billing rates at any point, which the CAC eventually requested and was granted by the Court.  Although the Court has discretion to determine hourly rates for the CAC members, the CAC has not cited any authority from the Plan documents that the Court has the discretion to *retroactively* review the hourly billing rates and direct the SF-DCT to pay the CAC a higher hourly rate which was not previously requested by the CAC, nor approved by the Court.  The CAC has not submitted any evidence to show that at the time the July 16, 2004 Order establishing the CAC's initial hourly rate, the Parties and the Finance Committee understood that at some future date, if there were sufficient funds available, the CAC would seek additional compensation based on a higher hourly rate and apply such to the previous work they performed so that the CAC members would then be fully compensated.

Based on the Declaration submitted by the CAC, the Finance Committee was provided on November 18, 2021, a copy of a memo requesting the CAC's

proposed compensation at the conclusion of the Settlement Trust. (ECF No. 1824, PageID.43009)  At the earliest, it appears that the Finance Committee had knowledge of the CAC's request for additional compensation in November 2021. However, the CAC was excluded from all discussions on funding requests from 2021 to 2024.  *Id*. at PageID.43010.  As this Court noted in its September 29, 2023 Order, the Plan language provided that the CAC must be included in all discussions with the Finance Committee, in addition to the Debtor's Representatives.  Based on the declaration submitted by the CAC, the CAC had not been included, in a recent analysis of the funds required for the proposed wind-down operations.  The Financial Advisor provided the funding analysis for the wind-down process, which included a line item for the CAC's compensation.  The CAC does not know how these numbers were generated since the CAC had no input into the document.  It is noted that there was no proposed 2025 Budget submitted to the Court, in light of the anticipated termination of funding of the SF-DCT.

The Court is concerned that the CAC has not been part of the discussions regarding the funding of the SF-DCT and the wind-down operations, despite the language of the Plan and the Court's September 29, 2023 Order.  The Court cannot understand the exclusion of the CAC from these discussions, in light of the fact

that the CAC is a party to all the agreements at issue. The CAC *must* be included in all future discussions and *must* be given any reports and analysis since 2021 as to the funding of the SF-DCT.

Even though the Finance Committee had knowledge of the CAC's request to retroactively seek compensation based on hourly rates not previously approved by the Court, as noted above, the CAC's request has not been shown to be supported by any Plan language, nor any agreement or understanding between the Parties and the Finance Committee at the time the initial hourly rate order was entered by the Court. The Court agrees it has discretion to determine the reasonable hourly rate and hours worked by the CAC. However, such discretion is guided by statutory and case law regarding the award of attorney fees.

The Bankruptcy Code provides that a bankruptcy court may award (A) reasonable compensation for actual, necessary services rendered by the ... attorney and by any paraprofessional person employed by any such person; and (B) reimbursement for actual, necessary expenses. 11 U.S.C.A. § 330(a)(1). Section 330(a)(3) provides that, "[i]n determining the amount of reasonable compensation to be awarded" to a "professional person, the court shall consider the nature, the extent, and the value of such services." 11 U.S.C. § 330(a)(3). And it instructs the courts to "tak[e] into account all relevant factors, including" the time spent, rates

18

charged, "whether the services were necessary ... or beneficial *at the time at which the service was rendered*," as well as other factors. *Id.* (italics added). "[T]he court shall not allow compensation for ... "unnecessary duplication of services; or services that were not--(i) reasonably likely to benefit the debtor's estate; or (ii) necessary to the administration of the case. *Id.* § 330(a)(4)(A). A reasonable attorney fee award is determined by the "lodestar" method–the reasonable hourly rate multiplied by the number of hours expended. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004); *Isabel v. City of Memphis,* 404 F.3d 404, 415 (6th Cir. 2005).

The Court has done so in approving the CAC's monthly request for fees. The Court has not found any support, by way of the Plan language, the Parties' agreement, statutory law, or case law, that the Court has discretion to retroactively award a "more reasonable hourly rate" than the Court previously approved and apply such to the hours of work the CAC previously performed. The Court denies the CAC's request for additional fees, beyond the fees the Court has already approved.

### D.   Summary

Based on the above analysis and findings, the Court finds that the conditions for the termination of funding required by the Plan and the Funding Payment Agreement have been met.   Dow Silicones complied and met its funding obligations to the Settlement Facility and the Litigation Facility under the Plan and the Funding Payment Agreement.   The Movants properly supported their Motion to Terminate Funding Pursuant to Section 2.01(c) of the Funding Payment Agreement and to Terminate the Settlement Facility Pursuant to Section 10.03 of the Settlement Facility and Fund Distribution Agreement.   Pursuant to the terms of the Funding Payment Agreement and the Settlement Facility and Fund Distribution Agreement, the SF-DCT shall proceed to wind-down its operations.   The declarations of the Claims Administrator, the Financial Advisor and the Independent Assessor indicate that the wind-down period, if commenced by January 1, 2025, shall conclude no later than March 31, 2025.

## III.   CONCLUSION/ORDER

For the reasons set forth above,

IT IS ORDERED that the Motion to Terminate Funding Pursuant to Section 2.01(c) of the Funding Payment Agreement and to Terminate the Settlement Facility Pursuant to Section 10.03 of the Settlement Facility and Fund Distribution

Agreement filed by Dow Silicones Corporation, the Debtor's Representatives, and the Finance Committee **(ECF No. 1796)** is GRANTED.  The Funding pursuant to Section 2.01(c) of the Funding Payment Agreement and the Settlement Facility pursuant to Section 10.03 of the Settlement Facility and Fund Distribution Agreement are terminated effective December 31, 2024.

IT IS FURTHER ORDERED that all Parties to the Plan and the various Agreements related to the Plan, the Reorganized Debtor, the Debtor's Representatives, the Claimants' Advisory Committee, and the Finance Committee, *must* confer as to the remaining matters in this case, including the wind-down activities and projections.

IT IS FURTHER ORDERED that the following general activities with respect to wind-down are as follows:

1.   The Claims Administrator and Financial Advisor are instructed to complete all necessary tasks to achieve final termination including closure of bank accounts, payment of all funds due to remaining staff, any other fees and expenses for vendors and contractors, and termination of storage of data and contracts for the storage of claims data by the end of the first quarter of 2025.

2.     The Claims Administrator is instructed to arrange for the long-term storage of the claims database on a suitable hard drive or drives.  Such data shall be maintained for a period of time to be set by the Court and shall be held and maintained as further instructed by the Court.

3.     The Claims Administrator shall transfer to the Reorganized Debtor the files of cancelled checks (which serve as evidence of releases) as provided in the Plan.

4.     The Finance Committee shall provide to the Court the summary of the resolution of claims.

5.     The Finance Committee and the Parties shall submit a final report.

6.     The Financial Advisor is instructed to prepare and submit the final audit of the SF-DCT and the final tax returns for the Trust.  The Financial Advisor shall endeavor to complete the preparation and submission of these documents as promptly as feasible. The Financial Advisor shall submit the audit and confirmation of tax filing to the Court.

7.     Any funds remaining in the Trust account at the conclusion of the wind-down activities are to be distributed to a neutral medical

research institute or university, selected by the Finance Committee after consulting with the Claimants' Advisory Committee.

8.      Once wind-down activities are complete, the parties shall provide a Trustee Direction to the Trustee instructing the Trustee to conclude its operations as provided in the Depository Trust Agreement and the parties shall assist the Trustee with the dissolution of the Depository Trust in accordance with the terms of the Depository Trust Agreement.

9.      At or near the conclusion of the wind-down activities, the parties shall provide a notification to the Court and request an order from the Court that will terminate and dissolve all positions appointed by the Court under the Plan – including the Claimants' Advisory Committee, Debtor's Representatives, Finance Committee, Trust, Trustee, Independent Assessor, Claims Administrator, Appeals Judge and Lien Judge, the Special Master for Closing and the Financial Advisor (once the final audit and tax filings are complete).  The parties will provide to the Court a proposed form of order.

10.     At the conclusion of wind-down activities, the parties shall also provide a proposed order directing the destruction of any claim

materials in the possession of any persons appointed by the Court or who were not subject to the Stipulation of the Finance Committee, Debtor's Representatives, and Claimants' Advisory Committee to Require All Vendors, Contractors, and Various Appointees to Return or Destroy All Data, Information and Materials Related to the Settlement Facility (ECF No. 1781) entered by the Court on July 24, 2024.

11.   Once wind-down activities are complete, Dow Silicones will dissolve the DCC Litigation Facility, Inc.


S/DENISE PAGE HOOD
DENISE PAGE HOOD
United States District Judge

DATED:  December 30, 2024